# EXHIBIT A

El Paso County - 120th District Court

Filed 10/31/2018 4:53 PM
Norma Favela Barcelea
District Cler
El Paso Count
2018DCV411:

CAUSE NO. _____

| | |
|---|---|
| **GESPA NICARAGUA, S.A.** | **IN THE DISTRICT COURT** |
| *Plaintiff* | |
| **v** | |
| **INABATA EUROPE GMBH, RECOM AG,** | **_____ JUDICIAL DISTRICT** |
| **FLEXTRONICS INTERNATIONAL USA, INC.,** | **EL PASO, TEXAS** |
| **FLEXTRONICS AUTOMOTIVE USA, LLC, AND** | |
| **MKG GMBH MONTAGEBAU KARL GLÖBEL** | |
| *Defendants* | **DEMAND FOR JURY TRIAL** |

## ORIGINAL PETITION AND JURY DEMAND

TO THE HONORABLE JUDGE OF THE COURT:

Plaintiff GESPA Nicaragua, S.A. (Hereafter "Plaintiff"), files this Original Verified Petition against Defendant Inabata Europe GmbH, Defendant Recom AG, Defendant Flextronics International USA, Inc., Defendant Flextronics Automotive USA, LLC., and Defendant MKG GmbH Montagebau Karl Göbel, (collectively "Defendants"), and in support hereof would show the Court as follows:

### I.    INTRODUCTION

Plaintiff purchased over forty-six thousand (46,000) "Black Panther" solar panels from Defendant INABATA for ultimate delivery and installation in a solar park near Puerto Sandino, Nicaragua. **Exhibit 1, at Appx. D (Brochure)**. However, under the guidance of Defendant INABATA, the Co-Defendants worked in concert to defraud Plaintiff.

Instead of providing the *Black Panther* panels, as clearly and unambiguously specified in Plaintiff's purchase agreement, Defendants acquired orphaned solar panels from the SunEdison bankruptcy. In a willful and deliberate act of deception, Defendants then underline relabeled the SunEdison panels and passed them off as if they were the agreed to premium quality *Black Panther* panels. **Exhibit 2 (Relabeling)**. The 46,000+ SunEdison panels were intentionally relabeled in FLEX's warehouse in El Paso, Texas. Defendants then shipped the counterfeit panels from El Paso, Texas to the Port of Los Angeles, and finally to Plaintiff's facility in Nicaragua, where Defendant MKG installed them. **Exhibit 3 (Shipping label)**.

In furtherance of their fraudulent scheme, Defendants also intentionally covered up the "SunEdison" logo on the shipping boxes, which contained the 46,000+ counterfeit panels. **Exhibit 4 (Boxes with Covered Labels)**.

After the panels were installed, Plaintiff discovered the deceptive scheme and gave notice to Defendants. **Exhibit 6 (Letter notifying of default).** Nevertheless, the Defendants proceeded to circle the wagons and cover up their *bait-and-switch* scheme. Defendants all communicated with Plaintiff, continuing to re-assure them that the counterfeit panels were in fact the premium quality *Black Panther* solar panels, specified in the purchase agreement. This was not true.

Plaintiff has now obtained a copy of the clandestine agreement between the defendants. In that agreement RECOM agreed to "*intermediate*" a deal where FLEX would "*relabel*" the panels and sell them to Inabata for a "*preferential price.*" **Exhibit 5 (the "Smoking Gun").**

Plaintiff has been damaged by Defendants' fraudulent conduct and counterfeiting activity and prays for damages, as provided by law and equity, and for such damages, as the jury awards.

## II.    Rule 190.3 – Discovery

1.  Pursuant to TEX. R. CIV. P. 190.3, Plaintiff requests that discovery be conducted under Level 2.

## III.    Rule 47 (C) – Relief Sought

2.  Pursuant to TEX. R. CIV. P. 47, at this time, Plaintiff seeks monetary relief over $1,000,000 and all other relief to which Plaintiff deems itself entitled.

## IV.    PARTIES AND SERVICES

3.  Plaintiff GESPA Nicaragua, S.A. (hereinafter "**GESPA**") is a foreign company with its principal place of business in Managua, Nicaragua. Because of GESPA's corporate formation as a *Sociedad Anónima* ("S.A."), it should be treated like an LLC for the purposes of jurisdiction. The owners of Gespa are citizens of the State of Louisiana and the Republic of Panama. GESPA was the prime "*Engineering Procurement and Construction*" ("EPC") contractor for the development of the 12.5MW solar generating facility near Puerto Sandino, Nicaragua.

4.  Defendant Inabata Europe GmbH (hereinafter "**INABATA**") is a company based in Germany. INABATA is actively in the business of trading various products (including electronic components, chemicals and plastics). For purposes of the Project, INABATA promised to provide GESPA with 46,000+ *Black Panther* panels.

5.  Defendant Recom AG (hereinafter "**RECOM**") is a foreign company with a principal place of business in San Francisco, California. (Notably, INABATA has an <u>ownership</u> interest in RECOM.) For the purposes of the Project, RECOM procured for INABATA 46,000+ counterfeit panels, and arranged to have them relabeled as *Black Panther* panels.

6.  Defendant Flextronics Automotive USA, LLC and Flextronics International USA, Inc. (collectively hereinafter "**FLEX**") are companies in Texas with principal places of businesses in

El Paso and Plano, Texas. (Upon information and belief, Flex is also a citizen of California and Michigan.) For the purposes of the Project, FLEX provided 46,000+ counterfeit panels from its SunEdison bankruptcy inventory stored in El Paso, Texas. (Notably, the panels provided were **not** *Black Panther panels*, but rather a counterfeit "***SunEdison***" panel.)

7.   Defendant MKG GmbH Montagebau Karl Göbel (hereinafter "**MKG**") is a foreign company with its principal place of business in Germany. MKG actually installed the counterfeit solar panels, failed to notify Plaintiff that the panels were fraudulently relabeled, disposed of evidence of the relabeling, and conspired with Defendants to conceal the deceptive substitution of the relabeled and inferior panels.

## V. JURISDICTION AND VENUE

8.   In accordance with the TEX. CIV. PRAC. & REM. § 17.042, this Honorable Court has jurisdiction over the Defendants. Upon information and belief, at all times all of the Defendants were working in concert when they:

-   acquired physical control of the 46,000+ counterfeit panels in El Paso, Texas;

-   stored the 46,000+ counterfeit panels in El Paso, Texas;

-   relabeled the 46,000+ counterfeit panels in El Paso, Texas; and,

-   shipped the 46,000+ counterfeit panels to the Plaintiff from El Paso, Texas.

Simply put, El Paso County, Texas, is the proper forum.

9.   Specially, Defendant INABATA reached into the state of Texas and purchased the solar panels which, were located in El Paso, Texas. The Agreement between Inabata and Recom concedes:

RECOM shall intermediate a transition between Inabata and Flextronics International USA, Inc. in accordance with ***Inabata shall purchase***, at a preferential price, 12.5MW of 270Wp Mono Full Black PV modules (hereinafter the "Products") ***which are currently stored in the USA.***

**Exhibit 5 ("Smoking Gun")**(emphasis added). Due to its specific and ongoing business activities in Texas, Inabata could reasonably anticipate being hailed into a court in Texas.

10. Specially, Defendant RECOM has had its preverbal hands all over the state of Texas. In fact, RECOM was the party which "*intermediate[d]*" the transaction between Inabata and Flextronics for the purchase of the "*Products*," which were located in El Paso, Texas. *Id.* As stated above, the agreement between Inabata and Recom concedes:

> ***RECOM shall intermediate a transition between*** Inabata and Flextronics International USA, Inc. in accordance with Inabata shall purchase, at a preferential price, 12.5MW of 270Wp Mono Full Black PV modules (hereinafter the "Products") ***which are currently stored in the USA.***

In doing so, RECOM had multiple communications with FLEX in Texas. Recom purposefully directed contacts to Texas, and due to its specific and ongoing business activities in Texas, RECOM could reasonably anticipate being hailed into a court in Texas.

11. Specially, Defendant FLEX has a facility in El Paso, Texas. Flex purposefully directs activity in Texas and due to its specific and ongoing business activities in Texas, FLEX could reasonably anticipate being hailed into a court in Texas.

12. Specially, Defendant MKG actively assisted the concealment of the counterfeiting activity, which occurred in Texas. Furthermore, MKG was actively immersed in the stream of commerce, as it accepted the counterfeit panels, which were relabeled in (and shipped from) El Paso, Texas. Because of MKG's activity, which directly concealed the counterfeiting activity in Texas, MKG could reasonably anticipate being hailed into a court in Texas.

13. In accordance with TEX. CIV. PRAC. & REM. §15.002, venue is proper in El Paso County, Texas because El Paso County is where part or all of the cause of action arose. Furthermore, one or more of the Defendants (including Defendant Flextronics Automotive USA, LLC and Defendant Flextronics International USA, Inc.) has a principle place of business in El Paso County, Texas.

## VII. MISNOMER / MISIDENTIFICATION

14. In the event that a party is misnamed or is not included herein, it is Plaintiff's contention that such was a "*misidentification*," "*misnomer*," and/or such are/were the "*alter ego*" of parties named herein. Alternatively, Plaintiff contends that such "*corporate veils*" should be disregarded to hold such parties properly responsible in the interest of justice.

## VI. CONDITIONS PRECEDENT

15. All conditions precedent to Plaintiff's claims against Defendants have occurred, been performed, satisfied, or otherwise fulfilled, in conformity with TEX. R. CIV. P. 54.

## VII. FACTUAL ALLEGATIONS

### A. The *Bait-and-Switch*

16. Plaintiff was engaged as the prime engineering, procurement and construction ("EPC") contractor for the design, specification, and acquisition of equipment, materials and components and for the construction of a **12.5 MW** solar generating facility to be built near Puerto Sandino, Nicaragua. The Project was valued in excess of **$20,000,000.00**.

17. In order to meet the Project objectives, Plaintiff entered into a contract with INABATA to purchase the **46,000** "*Blank Panther*" solar panels and the related components required for the solar facility. Exhibit 1, Appex D).

18. INABATA further agreed to provide short term financing of the purchase of the panels and components on the condition that Plaintiff would use *Black Panther* solar panels from its affiliate, Defendant RECOM. (It has since been discovered that INABATA holds a significant ownership interest in and exercises significant control over RECOM, a probable motive for tying the conditions of using RECOM panels to the purchase.)

19. Plaintiff agreed to this condition. Thereupon, Plaintiff and INABATA entered into a Purchase Agreement, which very specifically designated that the solar panels be delivered as *Black Panther* panels. Only *Black Panther* solar panels, of a specific model number, could and would be used in the construction of the Project, which dictated specific specifications, capacity, and construction required. Exhibit 1, at Appx. D.

20. Relying on Defendants INABATA and RECOM to fulfill the agreement for the panel's specifications and technical data, Plaintiff completed the design, specifications, licensing and permitting of the construction of the project.

21. Relying on its agreement with INABATA, Plaintiff then entered into an agreement with Defendant MKG to construct and install the *Black Panther* solar panels and components for the Project at the site.

22. INABATA was to provide, directly to MGK, the majority of the components, equipment, and material to install the specified *Black Panther* panels. However, instead of providing the correct *Black Panther* panels, INABATA conspired with the other Defendants ("the Enterprise") to switch out the *Black Panther* panels and provide counterfeit *SunEdison* panels to MKG for installation. See Exhibit 2.

23. MKG moved the 46,000+ counterfeit panels and components from the port to the Project site and unpacked the panels and components. MKG quickly disposed of the packaging materials

that exhibited the "*SunEdison*" labeling and intentionally concealed that information from Plaintiff. See Exhibit 4.

24.  On or about October of 2016, MKG commenced construction of the solar facility using the counterfeit panels.  MKG was aware of the fact that the counterfeit panels were <u>not</u> *Black Panther* panels.

25.  When Plaintiff became suspicious of the true identity of the panels, it made inquiries to all of the Defendants about the potential problem.  In multiple emails, telephone conferences and in-person conferences in Nicaragua and Florida, Defendants continued their deceptive, false and fraudulent representations that the counterfeit relabeled SunEdison panels were actually the correct *Black Panther* panels, specified in the contracts.

26.  Defendants knew that the solar park was built around *specific specifications* and for the *Black Panther* panels; the counterfeit panels compromised entire solar park.

27.  Plaintiff has now obtained reports from two (2) independent authorities, confirming that the panels delivered were not the proper *Black Panther* panels specified in the contracts, but were actually counterfeit, relabeled SunEdison panels manufactured in 2015.

**B.  The Clandestine Agreement**

28. Not often is a conspiracy to commit fraud reduced in writing, as it is in this case. On November 20, 2016, the defendants memorialized their clandestine agreement in a document entitled "*Commission and Set-off Agreement.*"  Exhibit 5 ("Smoking Gun").

29. The terms of the conspiracy were as follows:

    a)   "The [Sun Edison] Product shall be Labeled RECOM." (Specification added)

    b) "RECOM shall provide and shall bear sole responsibility for all warranties regarding the Products. RECOM shall indemnify, defend and hold harmless Inabata from and against any claim, demand, lawsuit, cause of action or losses of any nature whatsoever, suffered or incurred by Inabata, arising out of, or in connection with any warranty claim."

    c) "RECOM authorizes INABATA to trade PV modules bearing the registered RECOM Community Trade Mark No. 012482832."

    d) "RECOM shall receive from Inabata, for the intermediation of the abovementioned transaction, a commission amounting to 0,15267 USD watt namely the amount of USD USD ("the commission"). The above amount is the result of the following calculation (12.500.000 Watts x 0,15267 USD-1.908.375 USD)"

See Exhibit 5. (typographical errors are original)

30. Effectively, INABATA and RECOM came up with this fraudulent scheme as a mode for RECOM to work off its debt.

31. As motivation for the agreement, it is clear, that Recom owed Inabata, owed in excess $5,300,000 as of September 30th, 2016. The amount was overdue and in order to settle the debt, Inabata and Recom entered into an agreement to commit fraud.

32. This Commission and Set-off Agreement demonstrates a risk of continuing harm. The fraudulent relabeling, as employed against Gespa and their solar field, only absolved Recom of approximately $1,900,000 (Recom would still owe Inabata approximately $3,400,000). There is a high risk that Recom, in an effort to pay off additional debt, will (or has) re-label more SunEdison solar panels stored in the Flextronics facility in El Paso, Texas, and sold them as ordered by Inabata.

### C. Pre-litigation Defense Tactic

33. The Defendants actively used conflicting forum selection clauses as a pre-litigation defense tactic to divest any single court from having jurisdiction over this conspiracy.

### *(Fraud in the Inducement of a Forum Selection Clause)*

34. The written agreement between Gespa's and Inabata includes a Forum Selection Clause ("FSC") indicating that all disputes should be resolved in Germany.  This made sense, as Inabata assured Gespa – *when negotiating the FSC* –that the panels *"came from Malaysia with European specification."*  See Nygart Declaration.  This was a false statement upon which Gespa relied when it agreed to the forum selection clause.  *Id.*

35. Further, Inabata promised Gespa that the *Black Panther* panels, were *"Manufactured in EU."*  See Id, and Exhibit 1.  This was also false statement upon which Gespa relied when it agreed to the forum selection clause.

36. It was understood at the time that Malaysia was a developing nation and was not a suitable forum, in the event of a dispute.  Based upon the false representations that the panels would be designed in Europe, manufactured in Europe, and built to European specification, Gespa agreed to Germany as a choice of forum.  Simply put, this agreement was induced by fraud. [1]

37. Inabata fraudulently misrepresented the geographic location, origin, and specifications of the solar panels, thereby fraudulently inducing Gespa into a FSC that is half a world away from the facts, evidence, and perpetrators of the bate-and-switch scheme.

---

[1] It is anticipated that Inabata will attempt to argue that the Plaintiff has filed an action in Germany, and that by doing so, it has conceded that Germany was the proper forum to have this dispute resolved.  However, this is not the case.  First, the German Court does not have jurisdiction over all of the parties.  Second, Gespa filed the action in an effort to comply with the Service Requirements under the Hague convention.  Third, Gespa has asked the German Court to stay further proceedings pending a resolution here in the Texas.

*(Conflicting Forum Selection Clauses)*

38. Each of the Defendants have taken the position that a dispute with them should be resolved in a separate forum. By implementing conflicting forum selection clauses into their respective agreements, Defendants seek to preclude the Plaintiff from having this entire matter heard in a single forum. For example,

   a) **Inabata** has taken the position that ***Germany*** is the only proper forum;

   b) **MKG**, has taken the position that Kingdom of the ***Netherlands***, is the only proper forum.

   c) **Flextronics** has taken the position that ***Texas***, is the only proper forum

   d) **Recom** claims that is ***not*** subject to jurisdiction anywhere in the united states.

This type of *prelitigation* defense tactic is not novel. Linda S. Mullenix,[2] *Gaming the System: Protecting Consumers from Unconscionable Contractual Forum-Selection and Arbitration Clauses,* 66 Hastings L.J. 719, 720 (2015)("No matter what courts attempt to do to rein in gamesmanship – by statute, rule, or judicial opinion – attorneys still manage to invent new means to gain litigation advantage through creative pre- and post-litigation practices.")

39. If all of the various forum selection clauses were enforced: the dispute with Defendant Inabata would be sent to the courts of Germany; the dispute with Defendant MKG would be sent to the Kingdom of the Netherlands; the dispute with Defendant Flextronics would remain in Texas; and, no one know where the dispute would Recom would end up. (Defendants' attempt to gerrymander the inexorably intertwined claims of fraud and conspiracy – *to opposite ends of the earth* – results in a quagmire of procedure, discovery, issue preclusion, claim preclusion, etc.)

---

[2] Morris & Rita Atlas Chair in Advocacy, University of Texas School of Law.

40. At the time Gespa signed the FSC with both Inabata and MKG, Gespa had no idea that these companies were conspiring to commit fraud. See Exhibit 5. As a matter of procedural due process, Plaintiff has a right to have this matter heard in a single forum.

41. Defendants attempted to hide behind their FSC's in order to gerrymander this single claim. Such a result would be unequitable.[3]

### VIII. CAUSES OF ACTION

### COUNT I—FRAUD

#### (Inabata's Fraud in the Inducement of the Forum Selection Clause)

42. Plaintiff incorporates by reference and re-alleges each and every paragraph and allegation as set forth in this Complaint.

43. Defendant Inabata told Plaintiff, that it would provide the solar panels that were (1) designed and manufactured in European; (2) made to European Specifications; and (3) assembled in Malaysia.

44. Defendant Inabata's representations were false. Upon information and belief, the panels were manufactured and assembled in Mexico, and designed and manufactured to U.S. specifications.

45. The Plaintiff agreed to have all disputes resolved in Germany because Defendant Inabata said the panels were designed and manufactured in Europe and would be made to European specifications.

---

[3] *See In Re Rolls Royce Corp.,* 775 F3d 671 (5th Cir. 2014). It is also anticipated that Defendant Inabata will attempt to argue that Federal Court Case No. EP-17-cv-306-PRM constitutes res judicata; however, that matter was dismissed by the Federal Court, *without prejudice.*

46. Defendant Inabata knew that the representations were false when they made their representations to Plaintiff. Defendant Inabata knew at the time that they were providing solar panels from a completely different location and manufactured to different geographic specifications.

47. The representations were made for the purpose of inducing Plaintiff into accepting the German Forum Selection Clause.

48. Plaintiff reasonably relied on Defendants' false representations and did not know of the falsity of the representations when they signed the forum selection clause.

49. As a direct and proximate result of Defendants' false and fraudulent statements, Plaintiff was induced to sign a German Forum Selection Clause. Defendant Inabata is now seeking to force Plaintiffs to litigate far away from the facts, evidence, and location where the fraud took place.

### (Inabata's Fraud in the Inducement of the Contract)

50. Plaintiff incorporates by reference and re-alleges each and every paragraph and allegation as set forth in this Complaint.

51. Defendant Inabata, made false representations to Plaintiff, that it would provide the *Black Panther* panels pursuant to its sales contract with Plaintiff.

52. The representation was material.

53. The representation was false.

54. When Inabata made that representation, it knew that representation was false, as shown in the commission, and offset agreement made between Defendants.

55. Defendant made the representations with the intent that Plaintiff would act on it and would be induced into entering into an agreement.

56.  Plaintiff relied on the representation and pressed forward with the construction of the solar facility.

57.  The representation caused plaintiff injury in an amount to be determined by the jury.

### (Fraudulent Misrepresentation by Each Defendant)

58.  Plaintiff incorporates by reference and re-alleges each and every paragraph and allegation as set forth in this Complaint.

59.  Each of the Defendants made false representations to Plaintiff, that panels being provided to the Plaintiff would be *Black Panther* panels pursuant to the sales contract.

60.  Defendants made false representations to Plaintiff, that the panels would have specific characteristics and design specifications.

61.  Defendants made false representations to Plaintiff, that the panels would have specific third-party certifications.

62.  Defendants knew or should have known that the representations were false when they made their representations to Plaintiff; they had no intention of providing the *Black Panther* panels at the time they represented that they would provide the *Black Panther* panels.

63.  The representations were made for the purpose of inducing Plaintiff to act by accepting and paying for the counterfeit SunEdison panels.

64.  Plaintiff reasonably relied on Defendants' false representations and did not know of the falsity of the representations until the panels had been installed.

65.  As a direct and proximate result of Defendants' false and fraudulent statements and actions, Plaintiff has suffered damages in the amount to be determined by the jury.

*(Fraud by Non-Disclosure by Each Defendant)*

66. Plaintiff incorporates by reference and re-alleges each and every paragraph and allegation as set forth in this Complaint.

67. Each of the Defendants concealed from or failed to disclose the truth to the Plaintiff about the true nature, origin, manufacturer, specifications and characteristics of the panels which were implemented into the solar facility.

68. Each of the Defendants had a duty to disclose the true nature, origin, manufacturer, specifications and characteristics of the panels which were implemented into the solar facility to the plaintiff, because they were in a position of trust and had unbalanced access to information.

69. Each of the Defendants knew that the Platin was ignorant of the true nature, origin, manufacturer, specifications and characteristics of the panels which were implemented into the solar facility.

70. Each of the Defendants knew the Plaintiff did not have equal opportunity to discover the true nature, origin, manufacturer, specifications and characteristics of the panels which were implemented into the solar facility.

71. Each of the Defendants was deliberately silent about the true nature, origin, manufacturer, specifications and characteristics of the panels which were implemented into the solar facility, when it had a duty to speak.

72. Each of these facts were material, and their falsity has affected not only the performance of the solar facility, but also Plaintiff's cost and ability to obtain insurance and permanent financing.

73. By failing to disclose the true nature, origin, manufacturer, specifications and characteristics of the panels which were implemented into the solar facility, each defendant intended to induce the Plaintiff into acceptance of the counterfeit panels.

74. The Plaintiff relied on each of the Defendants' nondisclosure.

75. As a direct and proximate result of Defendants' nondisclosure, Plaintiff has suffered damages in the amount to be determined by the jury.

**COUNT II—CONSPIRACY**

76. Plaintiff incorporates by reference and re-alleges each and every paragraph and allegation as set forth in this Complaint.

77. Each of the Defendants was a member of a compare members of a group of five persons.

78. The object of the combination was to accomplish an unlawful purpose, or a lawful purpose by unlawful means; including an unlawful purpose of affixing false trademark emblems, deceiving plaintiff by re-packaging and re-labeling the panels.

79. Each of the Defendants understood that Plaintiff was requiring very specific *Black Panther* panels, as required by their specific solar field.

80. Each of the Defendants knew that the panels, which were provided to Plaintiff, were not the correct specified *Black Panther* panels, and were, in fact, relabeled counterfeit SunEdison panels.

81. Each of the Defendants had a meeting of minds and worked in conjunction to mislead the Plaintiff and conceal the true nature of the counterfeit panels. Specifically, the Defendants attempted to pass off the Counterfeit panels as though they were in fact *Black Panthers Panels*.

82. At least one member committed a unlawful, overt act (e.g.., relabeling the panels) to further the course of action.

83. Plaintiff reasonably relied on each of the Defendants to provide truthful and accurate information and did not know of the falsity of their representations until the independent acceptance inspections revealed that relabeled counterfeit SunEdison panels had been installed.

84. Plaintiff suffered injury as a proximate result of the wrongful act in an amount to be determined by a jury.

### COUNT III—RICO § 1962(c)

85. Plaintiff incorporates by reference and re-alleges each and every paragraph and allegation as set forth in this Complaint.

86. **INABATA is the <u>sole</u> Defendant in this Count.**

87. INABATA is the "**Person**" who, through its enterprise, engaged in a pattern and practice of affixing and trafficking of goods bearing counterfeit marks in proscription of 18 U.S.C. § 1962(c).

88. The "**Enterprise**" is identified as RECOM, FLEX, MKG, and their affiliates, all of whom were engaged in the affixing and trafficking of goods bearing counterfeit marks as an "association–in-fact" enterprise.  (INABATA is not herein referred to as the RICO enterprise.)

89. The Defendant has an ownership interest in one of more of the Enterprise entities. See Exhibit 5 ("Smoking Gun")

90. Throughout the relevant time, Defendant acted in concert with the enterprise in affixing and trafficking of goods bearing counterfeit marks, which falsely indicated the panels' specifications, characteristics, certification, and even the true country of origin.

**(RICO Specificity)**

a)  INABATA had engaged in a prior transaction with RECOM, upon which RECOM had an outstanding debt to INABATA in excess of $2,374,000 USD, as of September 30, 2016.  INABATA used the fact that RECOM was indebted to it to compel RECOM to act as an intermediary in brokering a counterfeiting enterprise for which RECOM's debt would be forgiven if RECOM would represent to Plaintiff that the SunEdison Panels were RECOM "*Black Panther*" panels.  See Exhibit 5.

b)  RECOM had a prior existing relationship with FLEX, by which RECOM had knowledge of FLEX's holdings.  Specifically, RECOM knew that FLEX had acquired thousands of solar panels from the bankruptcy of SunEdison.  RECOM knew that FLEX was looking to offload the panels for at a deep discount, i.e., a "*Preferred*" price.

c)  Plaintiff is aware that beginning in at least October 2016, the Enterprise actively engaged in the continuous and ongoing trafficking of goods bearing counterfeit marks, and to engage in wire fraud.  Such conduct constitutes a "Racketeering Activity" as defined in 18 U.S.C. § 1961.  See 18 U.S.C. § 2320.  Upon information and belief, members of the Enterprise engaged in similar conduct directed toward other customers.

d)  Between October of 2016, and December of 2016, the Enterprise engaged in the trafficking of goods bearing counterfeit marks.  Such conduct constitutes a "Racketeering Activity" as defined in 18 U.S.C. § 1961.  See 18 U.S.C. § 2320.

e)  The Racketeering Activity affected both interstate and foreign commerce, as the panels were transported interstate and then into a foreign country.

f)   Between October 2016 and December 2016, the Enterprise created and affixed in excess of 46,000 labels onto the SunEdison panels, which falsely indicated that they were *Black Panther* panels.

g)   Between October 2016 and December 2016, the Enterprise created and affixed onto the counterfeit panels labels, They used (2) two separate fraudulent counterfeit marks as predicate acts on each of the 46,000 panels:  (i) they used fraudulent counterfeit marks for the TÜV Rheinland certification; and (ii) they used fraudulent counterfeit marks for the TÜV SÜD certification as well.  Exhibit 7 (*"forged documents"*)

h)   Each counterfeit label affixed to a panel, a box, or even instillation manual (whether by use of the false label Black Panther, TÜV Rheinland, or TÜV SÜD) constituted a separate predicate act of racketeering activity that was connected to the conduct and control of an enterprise and constitutes a pattern of actions.  To be clear, the Enterprise's activity of false labeling was continuous and ongoing.  Because the enterprise is in the business of selling panels it is reasonable to believe they will deploy this same RICO activity in the future with other customers.

i)   In addition, the Enterprise continues to transmit false information by mail or wire, as it continues to represent to both Plaintiff and the general public, that the panels sold to Plaintiff were Black Panther panels.  Exhibit 8.  The purpose for the Enterprise's false press release is to enhance the Enterprise's own reputation, and to deceive both the general public and other future purchasers.

j)   In addition, there is substantial risk of additional predicate acts, because of the additional debt owed by Recom to Inabata.

k)  At no time did any of the Defendants truthfully inform Plaintiff that the panels they intended to deliver were orphaned SunEdison panels and <u>not</u> *Black Panther*.

l)  In furtherance of their counterfeiting activity, the Enterprise covered up or removed the SunEdison marking, which were on shipping containers.

m)  In furtherance of their counterfeiting activity, the Enterprise falsified shipping documents by falsely stating the origin of the panels to both Plaintiff and the U.S. Government.

n)  All of the predicated acts were continuous, related, and occurred within the last 10 years.

91. Defendant's counterfeit labeling was done knowingly and with the intent to deceive. Moreover, Defendant conspired with the above-identified enterprises to engage in the counterfeit labeling to defraud Plaintiff of its money for itself and its enterprise.

92. Defendant directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

93. All acts of counterfeit labeling constitute a pattern of racketeering activity connected to the conduct and control of an enterprise. *See* 18 U.S.C. § 2320.  As such, Defendant has violated the RICO Act.

94. As a direct and proximate result of Defendant's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been directly harmed and financially injured in its business in an amount to be determined by the jury.

## COUNT IV—Alternative Pleadings

### *(Unjust Enrichment)*

95. Plaintiff incorporates by reference and re-alleges each and every paragraph and allegation as set forth in this Complaint.

96. Defendants fraudulently induced Plaintiff to enter into various agreements with Defendants by promising that they would provide and install *Black Panther* panels.

97. Defendants made the false statements for the purpose of inducing Plaintiff's reliance.

98. Plaintiff relied upon Defendants' false statements and paid Defendants money.

99. As a direct result of Defendants' unjust conduct, they have been enriched in the amount to be determined by the jury.

### *(Breach of Contract)*

100.     If the court finds the existence of a contract between the parties, Plaintiff materially complied with the terms of the agreements.  Defendants failed to perform their obligations under the contract(s), by failing to provide *Black Panther* panels.

101.     As a result of Defendants' breach, Plaintiff has suffered damages, in the amount to be determined by the jury.

102.     Plaintiff seeks Attorney's fees pursuant to TEX. CIV. PRAC. & REM. § 38.001.

## IX. PRAYER

103.     WHEREFORE, Plaintiff respectfully requests a judgment against Defendants, for:

a)  Compensatory Damages;

b)  Equitable Relief;

c)  Exemplary Damages;

d)  Attorneys' Fees, Costs, and prejudgment and post judgment interest;

e) Treble Damages for Inabata's their engagement in racketeering activity; and,

f) Plaintiff further prays for all other relief provided by law, justice and equity.

## X. JURY DEMAND

104.  Wherefore, Plaintiff respectfully requests a trial by jury.

Dated: October 31, 2018.                    Respectfully submitted,

By: */s/ Joshua H. Sisam*

Joshua H. Sisam, *Esq.*
TX No. 24079346
MN No. 0394786
**Sisam & Associates LLP**
110 Industrial Drive
Boerne, Texas 78006
(830) 428-0333 – Office
(830) 331-4044 – Fax

**ATTORNEY FOR PLAINTIFF**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**El PASO DIVISION**

| | |
|---|---|
| GESPA Nicaragua, S.A. | |
| Plaintiff, | Case Number: 3:17-cv-00306-PRM |
| v. | |
| | Declaration of Morten Nygart |
| Inabata Europe GmbH, | |
| Recom AG, | |
| Flextronics International USA, Inc., | |
| Flextronics Automotive USA, LLC, and | |
| MKG GmbH Montagebau Karl Göbel, | |
| Defendants. | |

## DECLARATION OF MORTEN NYGART

1. My Name is Morten Nygart. I am over the age of 21.

2. I make this Declaration based upon my personal knowledge.

3. I am the person who gave the final approval on behalf of Plaintiff on all agreements related to this action.

4. Plaintiff would have never entered into any agreement with Defendant Inabata Europe GmbH or Defendant MKG GmbH Montagebau Karl Göbel if I knew that the panels were the product of a SunEdison bankruptcy and not Recom "*Black Panther*" panels.

5. We specifically insisted that the panels would come from Malaysia with European specifications and not from Mexico or the United States with U.S. specifications. I was repeatedly told that the panels were from Malaysia. Plaintiff would never have agreed to any forum other than Texas, United States, if we had known that the panels were being sent from Texas.

---

6. We were not told that the panels were a result of a bankruptcy in the United States. Since the panels were being shipped from Texas and since the manufacturer was Flex in the United States, I would have insisted on Texas as the forum to have any disputes resolved. The reason is that Texas would be the logical place for any dispute to be resolved. (E.g., the panels were stored in Texas, relabeled in Texas, shipped from Texas, and even the boxes the panels were shipped in had the name SunEdison covered up in Texas).

7. I relied heavily upon what I was told by INABATA about the type of panels (Recom *"Black Panther"*) being supplied, as well as the origin of the panels, when Plaintiff signed the documents which contained a forum selection clause. All of our studies, configurations, and subsequent approvals in the Republic of Nicaragua were based on the Recom "Black Panther" specifications provided by INABATA and Recom. I now know that I was misled. INABATA's false statements led directly to Plaintiff's signature on the documents.

8. I personally know that MKG received the panels in Nicaragua. I also know that MKG received some panels that were shipped from the United States at the customs office in Nicaragua. I found out that the panels, received and installed by MKG were not Recom *"Black Panther"* panels. After I finally discovered there was a problem, I personally exchanged various emails with <u>all</u> of the Defendants on the same email, including Flex and MKG, in an attempt to identify the true origin, specifications, and certifications of the panels.

9. Additionally, I now understand that Flex manufactured the SunEdison panels Plaintiff received. I have personally seen the installation manual for the SunEdison panels. *See* Exh. A. I have personally seen the installation manual for Recom *"Black Panther"* panels. *See* Exh. B. Recom *"Black Panther"* panels have specific serial numbers which do not coincide with the panels we received. The installation manual makes it clear that the panels are not Recom *"Black Panther."* I personally know that the installation manual provided to assist MKG was for the installation of SunEdison panels. This further shows that MKG, as well as the other Defendants, was communicating with Flex (the actual manufacturer) in the Western District of Texas regarding this transaction.

10. INABATA, Recom, and Flex all misrepresented to me the origin and the certification of the panels in various emails in 2016 and 2017.

I declare the forgoing to be true and correct under penalty of perjury under the laws of the United States of America.  Further your Declarant sayeth naught.

_____

Morten Nygart

Signed this Wednesday of February 21, 2018.



# Installation Manual

## for SunEdison Silvantis 60 cell Photovoltaic Modules

**Product List:** M245CyC, M250CyC, M255CyC, M260CyC, M265CyC, M270CyC, M245KyC, M250KyC, M255KyC, M260KyC, M265KyC, M270KyC, F245CyC, F250CyC, F255CyC, F260CyC, F265CyC, F270CyC, F245KyC, F250KyC, F255KyC, F260KyC, F265KyC, F270KyC



## Table of Contents

1.0 INTRODUCTION.................................................................................................. 2

2.0 PHOTOVOLTAIC MODULES PRODUCT CODE........................................................ 2

3.0 MODULE OVERVIEW......................................................................................... 2

3.1 STORAGE, UNPACKING, AND HANDLING........................................................ 2

3.2 SAFETY...................................................................................................... 3

3.3 MAINTENANCE............................................................................................ 3

4.0 MECHANICAL INSTALLATION............................................................................ 4

4.1 PLANNING AND DESIGN............................................................................... 4

4.2 MODULE MOUNTING OPTIONS....................................................................... 4

4.3 ADDITIONAL MOUNTING METHODS................................................................ 7

4.4 MECHANICAL INSTALLATION WARNINGS........................................................ 7

5.0 ELECTRICAL INSTALLATION............................................................................. 7

5.1 PLANNING AND DESIGN............................................................................... 7

5.2 MODULE WIRING......................................................................................... 8

5.3 GROUNDING.............................................................................................. 8

5.4 ELECTRICAL INSTALLATION WARNINGS........................................................ 10

6.0 DISCLAIMER OF LIABILITY............................................................................. 10

7.0 APPENDIX.................................................................................................... 11

7.1 MODULE ILLUSTRATIONS............................................................................ 11

7.2 PHYSICAL PARAMETERS.............................................................................. 11

7.3 PRE-MOUNTED CABLES AND CONNECTORS.................................................... 12

## Customer Service

SunEdison Products Singapore PTE. LTD.
11 Lorong 3 Toa Payoh
Block B Jackson Square 4th Floor
Singapore 319579

Fax: (65) 6681-9301
Email: modules.info@sunedison.com
Website: www.sunedisonsilicon.com/solarmaterials

© Copyright 2013 SunEdison, Inc.

Exh. A

## 1.0 INTRODUCTION

The purpose of this guide is to provide general information regarding the proper installation and handling of SunEdison photovoltaic modules that serve residential, commercial, and industrial segments. System design, construction, and commissioning should be performed by qualified personnel only.

To ensure system integrity, designers, installers and operators must meet all mechanical and electrical requirements for the system and its components. It is the responsibility of the system designer and installer to ensure that all codes and requirements are followed as well.

Please review all the sections that pertain to proper installation of modules listed in this guide. The instructions detailed in this guide must be followed throughout the module's lifetime deployment. If you need additional information about the safe, proper use and handling of SunEdison photovoltaic module products, please contact SunEdison.

## 2.0 PHOTOVOLTAIC MODULES PRODUCT CODE

This guide is to be used for SunEdison Silvantis 60 cell photovoltaic (PV) module installation. Please refer to the following module numbers before using the guide:

Original Version:  M245CyC, M250CyC, M255CyC, M260CyC, M265CyC, M270CyC, M245KyC, M250KyC,
M255KyC, M260KyC, M265KyC, M270KyC, F245CyC, F250CyC, F255CyC, F260CyC, F265CyC, F270CyC,
F245KyC, F250KyC, F255KyC, F260KyC, F265KyC, F270KyC

## 3.0 MODULE OVERVIEW

SunEdison Silvantis Photovoltaic modules consist of a series of electrically interconnected crystalline silicon solar cells that are sealed within a laminated sheet of tempered glass superstrate* and EVA/back-sheet substrate. These laminates are secured inside an aluminum frame to provide rigidity and a means for attachment to mounting sub-structures. The frames should not be modified or removed. *Tempered glass may have anti-reflective coating.*

- Photovoltaic modules are designed and constructed for outdoor use. Do not submerge modules in water at any time.
- The front and back of each module is labeled with a product bar code. Do not cover, remove or deface these labels. This may be required for product identification.
- Damage to the glass surface or the anti-reflective coating can impact the power output and overall efficiency of the system. Scratches, handling marks, or any damage to the glass surface must be avoided.
- For best performance and to avoid potential issues, keep the front side of the module clean and free of obstructions including covers, tape, adhesives, paint and debris.

### 3.1 STORAGE, UNPACKING, AND HANDLING

- Packaged modules must be stored in a dry and ventilated area.
- Packaged modules must not be exposed to rain, snow, hail or other environmental conditions that may compromise the packaging material and the modules.
- Packaged modules must be on appropriate provided pallets and must not be stacked more than two pallets high for storage.
- Once the modules are opened, store modules in a dry and ventilated room.
- Modules should never be stored in a wet environment.
- Upon unpacking, do not carry a module by its wires or junction box. Only carry a module by its frame with two or more people.
- Precaution should be taken to avoid damage to the glass surface with or without anti-reflective coating due to improper handling during storage or unpacking. Do not place or store modules with the glass facing down.
- Keep all electrical contacts clean and dry.
- All modules are manufactured with a sealed junction box and pre-attached cables and locking connectors. These components should not be modified or tampered with in any way.

© Copyright 2013 SunEdison, Inc.

**Exh. A**

- Do not allow unauthorized persons near the installation site or storage area of modules.
- Do not place any load on the module or twist the module frame.
- Do not stand, step, walk, or jump on the module.
- Do not drop or place objects on the modules such as tools,
- Do not handle modules with bare hands and avoid scratches, handling marks, or any damage especially to the front glass of the module, backsheet, or electrical components,
- Do not mark the modules with sharp in struments.
- Do not leave a module unsupported or unsecured.
- Do not modify module frames in any way.

## 3.2 SAFETY

The following safety guidelines and best practices should be followed:

- All installations must be performed in compliance with all applicable regional and local electrical codes or other national or international electrical standards.
- Use insulated tools during installation, troubleshooting and maintenance of photovoltaic modules.
- Wear suitable protection to prevent direct contact with module's electrical output and mechanical sharp edges.
- Cover the front of the modules with an opaque material to stop production of electricity when installing or working with a module or wiring.
- Modules connected in a series should not be disconnected under illumination. Disconnecting modules under illumination may cause electrical arcing which may result in burns, fires or other problems.
- Follow industry best practices when commissioning, trouble shooting, disconnecting, or connecting a PV system.
- Trouble shooting should include planning, checking, disconnecting, cause seeking, replacement, and record keeping.
- Do not install or handle the modules or their components when they are wet or during periods of high wind.
- Do not attempt to disassemble, repair, or open any part of the module including junction box or sub-components.
- Do not artificially concentrate sunlight on a module.
- Do not install or handle any broken modules. If a module is broken, or the back sheet is torn, contact with the surface or frame can cause an electrical shock.
- Do not wear rings, jewelry, watches, or other metallic items while working with photovoltaic modules.

## 3.3 MAINTENANCE

Check modules, glass, and frames for damage. Regularly inspect all SunEdison Silvantis Solar Modules for safe electrical connections, sound mechanical connections, and freedom from shading and corrosion. If dirt or debris buildup becomes excessive, periodically clean the glass only with a soft cloth using mild, non-abrasive detergent and water. When using mild cleaning liquids, a neutral pH in the range of 6.0 to 8.0 is recommended. Chemicals with pH less than 6.0 or greater than 8.0 should be avoided as it may damage the glass surface and/or the AR coating. Please consult with system designer to decide the cleaning and inspection frequency according to local environmental conditions.

Do not power wash or use harsh cleaning materials or objects such as scouring powder, steel wool, scrapers, blades, or other sharp instruments to clean the glass surface of the module. Use of such materials will invalidate the product warranty.

**WARNING: Use caution when cleaning the back surface of the module to avoid scratching the substrate materials.**

© Copyright 2013 SunEdison, Inc.

Exh. A

## 4.0 MECHANICAL INSTALLATION

### 4.1 PLANNING AND DESIGN

- Before installation, check to ensure the sub-structure will accommodate expected system loads. This includes and is not limited to: roof, foundations, mechanical structure, and mechanical connections.
- For roof installations, utilize a fire-resistant roof covering rated for the application. A minimum clearance of 6 inches is required between the roof and bottom of the module frame.
- Mechanical structures should not contact the module backsheet, any racking, or microinverter under any expected load conditions
- Consider the following factors during system design, which will influence performance:

  a) SunEdison solar modules produce the most power when they are pointed directly at the sun, and should be tilted for optimum system performance.
  b) Proximity to obstructions such as: walls, buildings, trees, groundcover, snow cover, or dust and debris that have the potential to shade or damage the modules.
  c) Elevated temperatures will decrease energy yield, so designs should ensure adequate airflow across the back of the module.
  d) Allow a minimum spacing of 10 mm between modules for thermal expansion.

### 4.2 MODULE MOUNTING OPTIONS
*For clamp or bolt mounting locations, please refer to table 4.2A*

- Each module should be mounted using four bolts through the mounting holes on the rear side of the module, or with four clamps over the front side. No more than two clamps per side may be used.
- Depending on the desired load capability of the array, modules may be mounted either perpendicular or parallel to the structure rails. Clamps can be mounted anywhere inside of the safe mounting range for each case illustrated in table 4.2A.
- If using bolts, use a bolt stack no smaller than ¼"-20 or M6, with two flat washers and a locking washer as shown in Appendix 7.1.
- To ensure an adequate clamping area, all clamps must be able to clamp within the range specified in Table 4.2A. All fasteners used to fix the modules with clamps should be no smaller than ¼"-20 or M6.
- To provide adequate fixing or clamping force, torque the fasteners to the manufacturers torque specifications.
- For all cases, the area of the supporting structure in contact with rear side of the module must comply with the dimensions specified in Appendix 7.1.
- All other structural dimensions, such as clamp and rail thickness, should be sized appropriately for the intended site load.

© Copyright 2013 SunEdison, Inc.
Exh. A

TABLE 4.2A

| MOUNTING CONFIGURATIONS | LOAD PARAMETERS | BOLT MOUNT LOCATIONS | CLAMP MOUNT LOCATIONS |
|---|---|---|---|
| **PERPENDICULAR MOUNTING (CASES 1 & 2)** Structural rails running perpendicular to the length of the module should be fixed via bolts or clamps at the mounting holes between each long side frame, OR at the holes on each short end frame. | **CASE 1** Maximum Rear Load: 2400 Pa or 50 psf  Maximum Front Load: 5400 Pa or 113 psf |  REAR VIEW |  Clamp mount allowable range  A  FRONT VIEW |
|  | **CASE 2** Maximum Rear Load: 2400 Pa or 50 psf  Maximum Front Load: 5400 Pa or 113 psf |  REAR VIEW |  Clamp mount allowable range  B  FRONT VIEW |
| **PARALLEL MOUNTING (CASE 3)** Structural rails running parallel to the length of the module should be fixed ONLY via bolts at the mounting holes or clamps within the allowable clamp range on each long side frame. | **CASE 3** Maximum Rear Load: 2400 Pa or 50 psf  Maximum Front Load: 5400 Pa or 113 psf |  REAR VIEW |  Clamp mount allowable range  A  FRONT VIEW |

Module Color Code: ● Mounting Hole Location    ▢ Module Rail    ▮ Clamp Mount Range

Clamp mount allowable range:  A:0 – 382 mm
                               B:0 – 248 mm

© Copyright 2013 SunEdison, Inc.

Exh. A

Installation Manual: SunEdison Silvantis 60 Cell PV Modules

TABLE 4.2A

| MOUNTING CONFIGURATIONS | LOAD PARAMETERS | | CLAMP MOUNT LOCATIONS |
|---|---|---|---|
| FULL LENGTH CLAMPING (CASES 4&5) When clamping the module full width across the ends it is unsupported along the unclamped edge. | CASE 4 | Maximum Rear Load: 2400 Pa or 50 psf Maximum Front Load: 5400 Pa or 113 psf | Clamp mount allowable range <br><br> FRONT VIEW |
| | CASE 5 | Maximum Rear Load: 2400 Pa or 50 psf Maximum Front Load: 5400 Pa or 113 psf | Clamp mount allowable range <br><br> FRONT VIEW |

Module Color Code: ▓ Clamp Mount Range

© Copyright 2013 SunEdison, Inc.
Exh. A

**4.3 ADDITIONAL MOUNTING METHODS**

4.3 Use of the PanelClaw system (Part Number 500000501) is permitted with SunEdison Solar PV Modules. Structures manufactured by PanelClaw Inc. use a special clamp, or "claw" designed to attached to the flange of the PV module at all four corners, on the two short frame ends. For proper placement, attach a claw over the module frame flange at each of the four designated locations and tighten the screw so that the claws are flush with the long and short ends of the module flange. This mounting method has been tested to a maximum rating of 50 psf in the negative and positive direction. See case two in Table 4.2A above as well as the PanelClaw installation guide for information on the installation of the clamps.

Figure 1: Illustrations of the Panel Claw



**4.4 MECHANICAL INSTALLATION WARNINGS**

- Installation and maintenance should be performed by qualified personnel only.
- Use insulated tools during installation, troubleshooting and maintenance of photovoltaic modules.
- Installers should adhere to all applicable local, regional, and national codes and regulations when designing and constructing the photovoltaic system.
- Do not stand or walk on any surface of the modules.
- Precaution should be taken to avoid damage to the glass surface with or without anti-reflective coating due to improper handling during installation.
- Mechanical structures should not contact the module backsheet under any expected load conditions.
- Additional mounting holes may not be drilled in the frame, glass or backsheet.
- Ensure that frame weep holes are not obstructed by the mechanical installation.

© Copyright 2013 SunEdison, Inc.

Exh. A

## 5.0 ELECTRICAL INSTALLATION

### 5.1 PLANNING AND DESIGN

- All modules are manufactured with a sealed junction box and pre-attached cables and locking connectors. These components should not be modified or tampered with in any way.

**NOTE:** Installers shall ensure that the polarized locking connectors are from the same supplier when connected on the same string. Do not mix polarized interlocking connectors from different manufacturers—including connections at the inverter, combiner boxes, and modules. Doing so will void the warranty. Refer to section 7.2 for connector types.

- Ensure connectors are clean and dry before establishing connection.
- Ensure that all wire, fusing and disconnects are appropriately sized for the system design according to national, regional, and local codes.
- Electrical characteristics are within plus or minus 5% of rated values for Isc, Voc, Impp and Vmpp. Modules may operate under conditions which may be significantly different than STC. SunEdison suggests multiplying specified ratings by a minimum of 1.25 times or more when specifying the system and balance of system components. Installer should adhere to all local, regional and national codes before planning and design of the system. *Refer to local codes before planning and design of the system. For detailed electrical characteristics, please refer to Section 7.0, page 10 through 11 of this Installation Manual.*
- Determine the maximum number of modules connected in series using the following formula: $N_s = Vmax_s / Voc_m$

  Where:
  $N_s$ equals the maximum modules in series
  $Vmax_s$ equals the maximum system voltage and is limited to a maximum of 1000 V for IEC and 600 V for UL.
  $Voc_m$ equals the module open circuit voltage at coldest conditions for the site (refer to local codes)

**WARNING:**  Installers should adhere to all applicable local, regional, and national codes and regulations when designing and constructing the photovoltaic system.

**NOTE:** In colder climates, it may be necessary to further reduce the maximum number of modules in series by using $Voc_m$ at the minimum expected operating temperature.

### 5.2 MODULE WIRING

- The module includes wires and polarized locking connectors from the junction box on the back of the module. The wires have sufficient length to connect to adjacent modules in either a portrait or landscape configuration assuming the minimum spacing between module frames. Field replacement of connectors or cables must be avoided and it will invalidate the product warranty. Polarized locking connectors of the same type and make are required for all series string wiring. The maximum operating temperature of wires and connectors should not exceed 85ºC.
- When installing panels in landscape orientation, use of the 1.3 meter lead lengths will ensure enough cable length to make adjacent, module-to-module, string connections, assuming a maximum spacing of 50mm between adjacent modules.
- When installation panels in portrait orientation, use of the .55 or 1.0 meter lead lengths will ensure enough cable length to make adjacent, module-to-module, string connections, assuming a maximum spacing of 50mm between adjacent modules.

© Copyright 2013 SunEdison, Inc.

**Installation Manual: SunEdison Silvantis 60 Cell PV Modules**

- Always wire modules so that proper polarity is maintained. Avoid placing excessive tension on the cables.
- There is no limit to the maximum number of series strings that can be combined in parallel. However, when doing so, each string must include overcurrent protection with a maximum rating of 15A. SunEdison recommends the use of DC rated fuses or overcurrent protection devices with the appropriate maximum voltage rating.
- Do not connect modules of three or more strings directly to a parallel bus.
- The cross-sectional area of cable and the connector type must be selected to align with the overall system design and should include the maximum short circuit current of the system, maximum operating temperatures, and cable run lengths.
- For field connections, use at a minimum #12 AWG/4 mm² wires insulated for a minimum of 85°C. Use copper wire only.

## 5.3 GROUNDING

**WARNING: Only negative grounding circuits (negative polarity to ground) shall be used within the array design. Transformerless inverters with floating grounding are not acceptable.**

- All module frames and mounting racks must be properly grounded in accordance with all local and national electrical codes, using methods and devices that are UL 1703/2703 certified.
- Lug Method: A copper, stainless steel, or tin plated grounding lug that is rated for outdoor use and uses no smaller than a #12 wire is acceptable. The use of a copper split bolt connector is authorized for use as well.
- Alternative Methods: Other code compliant frame grounding methods that are certified to UL 1703/2703 are acceptable.
- The frame has predrilled holes marked with a grounding sign as illustrated below. These holes should be used exclusively for grounding purposes and may not be used for any other purpose. **Do not drill additional or modify existing holes in the frame.**

Figure 1: Image of the grounding holes



© Copyright 2013 SunEdison, Inc.

Exh. A

Installation Manual: SunEdison Silvantis 60 Cell PV Modules                                                 10 of 12

**5.4 ELECTRICAL INSTALLATION WARNINGS**

- Installation and maintenance should be performed by qualified personnel only.
- Use insulated tools during installation, troubleshooting and maintenance of photovoltaic modules.
- Installers should adhere to all applicable local, regional, and national codes and regulations when designing and constructing the photovoltaic system.
- Photovoltaic modules produce DC electrical energy from light. When illuminated, each module can have a DC potential of greater than 45V and should be handled with care.
- Disconnecting modules under illumination may cause electrical arcing which may result in burns, fires, or other problems. Modules connected in series should not be disconnected under illumination.
- Always use a wire management system that keeps wires and cables out of direct contact with edge surfaces which could cut or damage the insulation. Do not allow wires to rest on the ground or roof surface.
- The module junction box should not be opened or modified in any way in the field.
- Do not use mirrors, lenses, or other techniques to magnify or concentrate additional light on the module.

## 6.0 DISCLAIMER OF LIABILITY

The information in this manual is based on SunEdison's knowledge and experience and is believed to be accurate. However, all information in this manual (without exception) including recommendations and specifications does not constitute a warranty, expressed or implied. SunEdison reserves the right to change the manual, the module, or specifications without prior notice.

The product warranty shall be VOID if handling and installation of the product does not conform to SunEdison's written installation instructions, or if the product has been reworked, repaired or otherwise modified in a manner not previously authorized by SunEdison in writing, or if the product is installed in an environment for which it was not designed. SunEdison shall not be liable for special, indirect, consequential, contingent or incidental damages related to or arising from the installation or use of the product by purchaser under any circumstances.

SunEdison Modules are certified by:      

SunEdison assumes no responsibility for any product application or use which is beyond SunEdison's direct control. SunEdison does not accept responsibility and expressly disclaims liability for loss, damage, or expense arising out of or in any way connected to such installation, operation or maintenance of the product.

International Product Certifications:
IEC 61215, IEC61730, CE, UL 1730, and Safety Class II certifications ensure that SunEdison solar products operate safely and comply with global electrical, performance, reliability, and fire safety codes.



| | |
|---|---|
| Certification | • IEC61215 certified by TÜV SÜD |
| | • IEC61730 certified by TÜV SÜD to ensure electrical safety |
| | • Stringent outgoing quality acceptance criteria benchmarked to industry standards |
| | • UL1703 listed by CSA for Canada and US |
| Environmental | AB8 (-50°C to +40°C) |
| Fire Resistance Rating | Class C |

© Copyright 2013 SunEdison, Inc.

**Exh. A**

Installation Manual: SunEdison Silvantis 60 Cell PV Modules                    11 of 12

## 7.0 APPENDIX

### 7.1 MODULE ILLUSTRATIONS

**M265 SOLAR MODULE DIMENSIONS mm[in]**

**MODULE DIMENSIONS**

A - 990 [39.0]
B - 1,658 [65.3]
C - 50 [2.0]
D - 30 [1.18]

**MOUNTING HOLE SPACING**

E - 950 [37.4]
F - 994 [39.1]

**CABLE LENGTH**

L - 1,000 [39.4]







Bolt Stack Details

### 7.2 PHYSICAL PARAMETERS

| | |
|---|---|
| Module Weight | 19.3 kg |
| Frame Material | Anodized Aluminum |
| Glass (mm) | 3.2 Tempered ARC glass |
| Connector | S418 BizLink/Amphenol PV Connector |

© Copyright 2013 SunEdison, Inc.

Exh. A

Installation Manual: SunEdison Silvantis 60 Cell PV Modules

## 7.3 PRE-MOUNTED CABLES AND CONNECTORS

| Mounting Configuration | Pre-mounted cables | Pre-mounted connectors |
|---|---|---|
| Type | TUV – PV1-F & UL – PV wire | locking polarized connectors |
| Cross section | 4.0 mm² | 4 mm dia. |
| Max. current | 16 A | 25 A |
| Max. system voltage | 1000 VDC/ UL 600 V | 1000 VDC/ UL 600 V |
| Temperature rating | -40°C to +90°C | -40°C to +85°C |
| Qualification | TUV 2PFG & UL PV wire | EN 50521 & UL for PV sys |

---

**For more information about SunEdison Silvantis modules, please visit www.SunEdisonSilicon.com**

© 2013 SunEdison, Inc. All rights reserved. SunEdison and the SunEdison logo are registered trademarks or trademarks of SunEdison, Inc. and/or its affiliates in the United States and certain other countries. All other trademarks mentioned in this document are the property of their respective owners. The use of the word partner does not imply a partnership relationship between SunEdison and any other company.

© Copyright 2013 SunEdison, Inc.

Exh. A

# RECOM

## Installation and Safety Instructions
## IEC version

This document applies to the following
RECOM Photovoltaic Modules:

60 Cell Monocrystalline Silicon Modules:
RCM-xxx-6MB (xxx= 250-305)

60 Cell Polycrystalline Silicon Modules:
RCM-xxx-6PB (xxx= 240-280)

72 Cell Monocrystalline Silicon Modules:
RCM-xxx-6MA (xxx= 290-360)

72 Cell Polycrystalline Silicon Modules:
RCM-xxx-6PA (xxx= 290-340)

www.recom-solar.com

**Exh. B**

RECOM

# CONTENTS

1   **Introduction**                                        **2**

How to use the

manual General

guidelines Handling

safety  Installation

safety  Fire safety

2   **Product Identification**                              **4**

3   **Mechanical Installation**                             **5**

Selecting the location  General

installation guidelines

Installation method

Attachment guidelines

4   **Electrical Installation**                             **9**

General installation guidelines

Grounding

5   **Maintenance**                                         **10**

6   **Disclaimer of Liability**                             **11**

7   **Decommissioning and Recycling**                       **11**

8   **Product Information**                                 **12**

RECOM

## INTRODUCTION

**Thank you for selecting RECOM Photovoltaic Modules. The RECOM Photovoltaic Modules are designed and manufactured to the highest quality standards. With correct installation and maintenance, RECOM modules will keep providing clean energy for many years.**

## HOW TO USE THIS MANUAL

- This manual contains information regarding the installation and safe handling of RECOM RCM-xxx-6MB (xxx= 250–305), RCM-xxx-6PB (xxx= 240–270), RCM-xxx-6MA (xxx= 290–355), RCM-xxx-6PA (xxx= 290-325), photovoltaic modules (hereafter referred to as "modules"), manufactured by RECOM AG, hereafter referred to as "RECOM".
- Installers must read and understand this guide prior to installation. For any questions, please contact our Global Quality & Customer Support department for further information. Installers should follow all safety precautions described in this guide as well as local codes when installing a module.
- Before installing a solar photovoltaic system, installers should familiarize themselves with its mechanical and electrical requirements. Keep this guide in a safe place for future reference (operation and maintenance) and in case of sale or disposal of the modules.

## GENERAL GUIDELINES

- Installing solar photovoltaic systems requires specialized skills and knowledge. Installation should only be performed by qualified persons.
- Installers should assume all risks of injury that might occur during installation, including, but not limited to, the risk of electric shock.
- One single module may generate more than 30V DC when exposed to direct sunlight. Contact with a DC voltage of 30V or more is potentially hazardous.
- Our module application class is class A, modules rated for use in this application class may be used in systems operating at greater than 50V DC or 240W, where general contact access is anticipated.
- Do not disconnect under load.
- Photovoltaic solar modules convert light energy to direct current electrical energy. They are designed for outdoor use. Modules can be ground mounted, mounted on rooftops, vehicles or boats. The proper design of support structures lies within responsibility of the system designers and installers.
- Do not use mirrors or other magnifiers to concentrate sunlight onto the modules. Artificially



concentrated light shall not be directed on the modules.

* When installing the system, abide to all local, regional and national statutory regulations. Obtain a building permit if necessary.
* Under standard test conditions, the electrical characteristics are within ±10 percent of the indicated values of Isc and Voc (irradiance of 1000W/cm², AM 1.5 spectrum, cell temperature 25°C).
* Only use equipment, connectors, wiring and support frames suitable for solar electric systems.

## HANDLING SAFETY

* Do not lift the module by grasping the module's junction box or electrical leads.
* Do not stand or step on the module.
* Do not drop the module or allow objects to fall on the module.
* To avoid glass breakage, do not place any heavy objects on the module.
* Be cautious when setting the module down on to a surface.
* Inappropriate transport and installation may break the module.
* Do not attempt to disassemble the modules, and do not remove any attached nameplates or components from the modules.
* Do not apply paint or adhesive to the module top surface.
* To avoid damage to the backsheet, do not scratch or hit the backsheet.
* Do not drill holes in the frame. This may compromise the frame strength and cause corrosion of the frame.
* Do not scratch the anodized coating of the frame (except for grounding connection). It may cause corrosion of the frame or compromise the frame strength.
* Be careful when setting the panel down onto a surface, particularly when placing it on a corner.
* A panel with broken glass or torn backsheet cannot be repaired and must not be used since contact with any panel surface or the frame can cause an electric shock.
* Work only under dry conditions, and use only dry tools. Do not handle panels when they are wet unless wearing appropriate protective equipment.
* When storing uninstalled panels outdoors for any period of time, always cover the panels and ensure that the glass faces upwards to stop water from collecting inside the panel and causing damage to exposed connectors.

## INSTALLATION SAFETY

* Never open electrical connections or unplug connectors while the circuit is under load.
* Contact with electrically charged parts of the panels, such as terminals, can result in burns, sparks and lethal shock whether or not the panel is connected.



- Do not touch the PV module unnecessarily during installation. The glass surface and the frame may be hot; there is a risk of burns and electric shock.
- Do not work in the rain, snow or in windy conditions.
- Avoid exposing cables to direct sunlight in order to prevent their degradation.
- Keep children well away from the system while transporting and installing mechanical and electrical components.
- Completely cover the module with an opaque material during installation to prevent electricity from being generated.
- Do not wear metallic rings, watchbands, ear, nose, lip rings or other metallic objects while installing or troubleshooting photovoltaic systems.
- Use only insulated tools that are approved for working on electrical installations.
- Follow the safety regulations for all other system components, including wires and cables, connectors, charging regulators, inverters, storage batteries, rechargeable batteries, etc.
- Only use connectors to connect modules to form a string, or connect to another device. Removing the module connectors will render the warranty void.

## FIRE SAFETY

- Consult your local authority for guidelines and requirements for building or structural fire safety.
- Roof constructions and installations may affect the fire safety of a building; improper installation may create hazards in the event of a fire.
- Use components such as ground fault circuit breakers and fuses as required by local authority.
- Do not use panels near equipment or in places where flammable gases may be generated.
- The modules have been rated Fire Class C, and are suitable for mounting onto a fire retardant roof covering rated for the application at a minimum distance of 10 cm from the panel to the roof plane.


## PRODUCT IDENTIFICATION

Each module has two labels providing the following information:

1. **Nameplate label:** describes the product type, rated power, rated current, rated voltage, open circuit voltage, short circuit current, (all as measured under standard test conditions), weight, dimensions and the maximum system voltage of 1,000 volts DC. The nameplate is attached on the backsheet of the module.

2. **Serial number barcode label:** each individual module has a unique serial number. The serial number has 18 digits. The third and fourth digits are the year code, and the fifth and sixth digits are

**Exh. B**



the month code. For example, xx1101xxxxxxxxxxxx means the module was made in January 2011. The seventh to the 14th digits are information regarding raw materials. Each module has a unique serial number barcode label. It is permanently attached to the interior of the module and is visible from the front of the module. This label is inserted prior to laminating.



911012209012220001

*Do not remove any labels. Removing a label will render the RECOM warranty void.*

## MECHANICAL INSTALLATION

### SELECTING THE LOCATION

- Select a suitable location for installing the modules.
- The modules should be facing south in northern latitudes and north in southern latitudes.
- For detailed information on the best installation angle, refer to standard solar photovoltaic installation guides or consult a reputable solar installer or systems integrator.
- The module should not be continuously shaded.
- Do not install modules near equipment or in locations where flammable gases may be generated or collected.
- Do not install modules under water or in continuous contact with water.
- Do not install modules in locations where they may be exposed to sulfur or harmful, corrosive chemicals.
- Do not install modules in environments with excessive dust, sand, salt mist or pollution.

### GENERAL INSTALLATION GUIDELINES

- The module mounting structure must be made of durable, corrosion-resistant and UV-resistant material.
- In regions with heavy snowfall in winter, select the height of the mounting system so that the lowest edge of the module is not covered by snow for any length of time.
- In addition, ensure that the lowest portion of the module is placed high enough so that it is not shaded by plants or trees or damaged by flying sand.
- The modules must be securely attached to the mounting structure.
- Provide adequate ventilation under the modules in conformity to your local regulations. A minimum distance of 10 cm between the roof plane and the frame of the module is generally recommended.



- Always observe the instructions and safety precautions included with the module support frames.
- Do not attempt to drill holes in the glass surface of the modules as this will void the warranty.
- Do not drill additional mounting holes in the frames of the modules as this will void the warranty.
- Before installing modules on a roof, ensure that the roof construction is suitable. In addition, any roof penetration required to mount the module must be properly sealed to prevent leaks.
- When installing a module on a pole, choose a pole and module mounting structure that will withstand the anticipated winds for the area.
- Dust building up on the surface of the module can impair module performance.
- RECOM recommends installing the modules with a tilt angle of at least 10 degrees, making it easier for dust to be washed off by rain.
- Observe the linear thermal expansion of the module frames (the recommended minimum distance between two modules 2 cm).
- Always keep the backsheet of the module free from foreign objects or structural elements, which could come into contact with the panel, especially when the module is under mechanical load.
- Ensure modules are not subjected to wind or snow loads exceeding the maximum permissible loads, and are not subject to excessive forces due to the thermal expansion of the support structures. See the following sections for more detailed information.

## INSTALLATION METHODS

- The module must always when be mounted in the manner specified in these instructions.
- The modules can be installed on the frame using mounting holes, clamps or an insertion system. The modules must be installed according to the following examples. Not mounting the modules according to these instructions will void the warranty.
- The modules can be installed in both landscape and portrait modes.
- The modules must be properly secured to their support so that they can withstand live load conditions, including wind uplift or snow load, to the pressure they have been certified for. It is the installer's responsibility to ensure that the clamps used to secure the modules are strong enough and are made of corrosion-resistant materials.
- Be sure that the clamps overlap the module frame by at least 9mm and that they do not bend or distort the frame.
- The module clamps must not come into contact with the front glass or deform the frame in any way. Avoid shading effects from the module clamps and insertion systems. Drainage holes in the module frame must not be closed or obscured by the clamps.

Exh. B



## ATTACHMENT GUIDELINES

Select the proper installation method depending on the mounting method and the load (See Fig. 1 for more detailed information).

**1**  Mounting holes:

Secure the module to the frame structure using the module mounting holes. A set of one stainless steel M6 bolt, one nut, two washers and two lock washers is recommended for each hole. Refer to Fig. 1 for location of holes.

**2**  Clamps:

The module may be fastened to the support frame by using clamps on the long or short side of the module frame. Refer to Fig. 1 for instructions.

**3**  Insertion system:

The module may be mounted on the support by using an appropriate insertion system with or without additional clamps. The insertion system may fasten the long or the short side of the module frame. Refer to Fig. 1 for instructions.

- The design load is 2,400 Pascal (Pa) for wind uplift and up to 5,400 Pascal (Pa) for snow (static) load.

- Refer to Fig. 1 for the static design loads of each mounting configuration. The installation methods applicable for 5,400 Pa are also valid for 3,800 Pa and 2,400 Pa. The installation methods applicable for 3,800 Pa are also valid for 2,400 Pa.



## Fig. 1





## ELECTRICAL INSTALLATION

### GENERAL INSTALLATION GUIDELINES

- Any hardware used must be compatible with the mounting structure material to avoid galvanic corrosion.
- It is not recommended to use modules with different configurations (grounding, wiring) in the same system.
- For applications requiring a high operating voltage several modules can be connected in series to form a string of modules. The system voltage is then equal to the sum of the voltage of each module.
- For applications requiring high operating currents several strings of modules can be connected in parallel; the system current is then equal to the sum of the current of each string of modules.
- The maximum number of series connected modules depends on system design, the type of inverter used and environmental conditions. The number of modules connected to an inverter should be within the inverter voltage limits and operating range. Do not exceed the maximum system voltage permitted by the manufacturer. Do not exceed the maximum system voltage of 1,000 V.
- There is no limitation on the number of modules that can be connected in parallel; the number of modules is determined by system design parameters such as current or power output.
- In the case of parallel connection a protection against excessive reverse currents must be installed. The maximum allowed reverse current is 15A and the maximum series fuse rating is 15A.
- Under normal conditions, a photovoltaic module is likely to experience conditions that produce more current and/or voltage than reported at standard test conditions. Accordingly, the values of Isc and Voc marked on this module should be multiplied by a factor of 1.25 when determining component voltage ratings, conductor ampacities, fuse sizes, and size of controls connected to the PV output.
- All relevant electrical installation codes and regulations should be observed for regulations on working at heights and fall protection.
- To prevent the cables and the connectors from overheating, the cross section of the cables and the capacity of the connectors must be selected to suit the maximum system short circuit current. For field connections, use minimum 4mm² copper wires insulated for an operating temperature of 85°C . Use connectors with an operating temperature of 105°C.
- The module junction box is rated IP67. Our modules are supplied with connectors to be used for system electrical connections.
- All connectors and cables must be securely fastened. They must also have UV resistance and approval for outside use. Secure cables using UV-resistant cable ties or other UV-resistant devices. Loose cables must be protected from abrasion, sharp objects, animals etc. Avoid exposing cables as far as possible to direct sunlight and permanent tension.
- The DC current generated by photovoltaic systems can be converted into AC and fed into a public



grid. As local utilities' policies on connecting renewable energy systems to their grids vary from region to region, a qualified system designer or integrator should always be consulted. Building permits, inspections and approvals by the local utility are generally required.

### GROUNDING

- All module frames and mounting racks must be properly grounded. All work must be carried by authorized installers in conformance to State and local codes and electricity standards.
- Proper grounding is achieved by bonding the module frame and all metallic structural members together continuously using a suitable grounding conductor. Grounding conductor may be copper, copper alloy, or other material acceptable for use as an electrical conductor. The grounding conductor must then make a connection to earth using a suitable earth ground electrode.
- RECOM modules can be installed with the use of third party grounding devices for grounding the frames of PV modules. The devices have to be installed in accordance with the grounding device manufacturer's specified instructions.
- Attach the grounding conductor at one of the two designated grounding holes (see Product Information) on the module frame.
- To avoid galvanic corrosion, use preferably stainless steel fastening materials.
- To avoid electrical shock, ground the frame of the module or array before wiring the system.

## MAINTENANCE

- To ensure optimum module performance, RECOM recommends the following maintenance measures:
- Clean the glass surface of the module when required. If dirt is allowed to accumulate, it will reduce power output or even cause further damage. Always use clean, soft water and a soft sponge or cloth for cleaning. A mild, non-abrasive cleaning agent may be used to remove stubborn dirt. Do not use high pressure hoses, they may damage the module. Clean the modules in the early morning to avoid thermal shock and damage. Never attempt to clean broken modules.
- Check the electrical, grounding and mechanical connections every six months to verify that they are clean, secure, undamaged and free of corrosion.
- If any problem arises, consult a professional for suggestions.
- Caution: observe the maintenance instructions for all components used in the system, such as support frames, charging regulators, inverters, batteries etc.



## DISCLAIMER OF LIABILITY

- As the adherence to this manual and the conditions or methods of installation, operation, use and maintenance of photovoltaic (PV) products are beyond RECOM's control, RECOM does not accept responsibility and expressly disclaims liability for any loss, damage, or expense arising out of or in any way connected with such installation, operation, use or maintenance.
- No responsibility is assumed by RECOM for any infringement of patents or other rights of third parties, which may result from the use of the PV product. No license is granted by implication or otherwise under any patent or patent rights.
- The information in this manual is based on RECOM's best knowledge and experience and is believed to be reliable; but such information including product specification (without limitations) and suggestions do not constitute a warranty, express or implied. RECOM reserves the right to change the manual, the PV product, the specifications, or product information sheets without prior notice.

## DECOMMISSIONING AND RECYCLING

- The dismantling of PV systems must be performed with the same care and safety precautions used during the initial installation. The PV system can generate hazardous voltage even after the system has been disconnected. Follow safety regulations for working with live electrical equipment.
- RECOM is a member of PV Cycle, the European association for voluntary take back and recycling of PV modules. Please contact PV Cycle at www.pvcycle.org for details regarding the recycling process.

---

RECOM

## PRODUCT INFORMATION

### STRUCTURAL DRAWINGS

## RCM-XXX–6MB & RCM-XXX–6PB



Module dimensions in mm

## RCM-XXX–6MA & RCM-XXX–6PA



Module dimensions in mm



RECOM

MONO



# Black Panther

   



Exhibit 1, at Appx. D

# RECOM

**MONO**

| | |
|---|---|
| Rated Power: | 270W |
| Power Tolerance : | 0%/+5W |
| Max. Power Voltage (Vmp): | 31.50V |
| Max. Power Current (Imp): | 8.58A |
| Open Circuit Voltage (Voc): | 38.50V |
| Short Circuit Current (Isc): | 9.10A |
| Module Efficiency | 16.4% |
| Series Fuse: | 15A |
| System Voltage: | 1000V DC(IEC) |



The module relative power loss at low light irradiance of 200W/m² is less than 5%.

| | |
|---|---|
| Pmax Temperature Coefficient | -0.45% /°C |
| Voc Temperature Coefficient | -0.34% /°C |
| Isc Temperature Coefficient | +0.06% /°C |
| Operating Temperature | -40~+105 °C |
| Nominal Operating Cell Temperature (NOCT) | 45 ± 2 °C |

| | |
|---|---|
| Dimensions | 1658mm x 990mm x 50mm |
| Frame | Black Anodized aluminum |
| Weight | 19 kgs |
| Front Glass | 3.2 mm AR low iron tempered glass |
| Output Cables: | TUV (2Plg1169 2007), UL 4703, UL44 4.0 mm² (0.006 in²), symmetrical lengths (-) 1000mm and (+) 1000 mm, MC4 type connectors |

| | |
|---|---|
| Container | 40'HC |
| Pieces per Pallet | 20 |
| Pallets per Container | 26 |
| Pieces per Container | 520 |

| | |
|---|---|
| Standard tests | IEC 61215, IEC 61730 |
| Quality tests | ISO 9001: 2000, ISO 14001: 2004, ISO17025: 2005 |
| Certifications | Class C Fire Rating, conformity to CE   Salt Mist and Ammonia Corrosion |
| Extreme wind and snow loads testing | Module certified to withstand extreme wind (2400 Pascal) and snow loads (5400 Pascal) |
| Positive tolerance | Guaranteed positive tolerance of up to 5W |
| Junction Box | IP67 Rated, 3 diodes |
| Warranties | • 10-year limited product warranty<br>• 25-year transferable linear power output warranty |

LINEAR PERFORMANCE WARRANTY





**Dealer:**

**Exhibit 1, at Appx. D**



**Exhibit 2**



Exhibit 2

Expeditors International Ocean

Expeditors
BILL OF LADING

SHIPPER (Name and Full Address)
FLEXTRONICS INTERNATIONAL USA INC
600 SHILOH ROAD
PLANO TX 75074
U.S.A.

CONSIGNEE (Name and Full Address/Non-Negotiable Unless Consigned to Order)
SOLARIS S.A.
EDIFICIO VISTA LAGO, #302,
DE EDIFICIO ESCALA 500 MTS AL SUR
MANAGUA LAS CUMBRES
NICARAGUA

NOTIFY PARTY/INTERMEDIATE CONSIGNEE (Name and Full Address)

BOOKING NUMBER 3LD949490
B/L NUMBER 6070094241

PLACE OF RECEIPT
LOS ANGELES, CA
PORT OF LOADING
LOS ANGELES, CA
PLACE OF DELIVERY
CORINTO

EXPORT CARRIER (Vessel, Voyage)
EIRLAND GUAYAQUIL V01607
PORT OF DISCHARGE
CORINTO

PARTICULARS FURNISHED BY SHIPPER

| MARKS AND NUMBERS / CONTAINER NUMBERS | NOS. OF PACKAGES | DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT (KGS) | MEASUREMENT |
|---|---|---|---|---|
| WEIGHT 95049.91 | 9 CTNR | AES X20161121164325 217 PCS SOLAR PANELS & PARTS, NOS | 95049.91 KG 209536.0 LB | |

****FREIGHT PREPAID***    SHIPPER LOAD & COUNT

| | | | | |
|---|---|---|---|---|
| MRKU5361479 | CY/CY | Size :40H | 26 PCS | |
| MSKU0522604 | CY/CY | Size :40H | 26 PCS Seal:4251 | |
| MSKU0677950 | CY/CY | Size :40H | 26 PCS Seal:4259 | |
| MSKU9696024 | CY/CY | Size :40H | 26 PCS Seal:4258 | |
| MRKU3454612 | CY/CY | Size :40H | 26 PCS Seal:4266 | |
| MRKU3012573 | CY/CY | Size :40H | 26 PCS Seal:4259 | |
| TRLU3760031 | CY/CY | Size :20 | 9 PCS Seal:4266 | |
| DMOO4155350 | CY/CY | Size :40H | 26 PCS Seal:4261 | |
| MRKU4982003 | CY/CY | Size :40H | 26 PCS Seal:4250 | |
| TOTALS: | | | 9 Container(s) | |

Page 1 of 1

REFRENDO

Exhibit 3

| | | | EXPORT REFERENCES |
|---|---|---|---|
PLANO TX 75074
U.S.A.

CONSIGNEE (Name and Full Address/Non-Negotiable Unless Consigned to Order)
SOLARIS S.A.
EDIFICIO VISTA LAGO, #303,
DE EDIFICIO ESCALA 800 MTS AL SUR
MANAGUA LAS CUMBRES
NICARAGUA

FORWARDING AGENT REFERENCES
EXPEDITORS
12200 S NELYTE AVE
HAWTHORNE CA 90250

POINT AND COUNTRY OF ORIGIN OF GOODS
U.S.A.

NOTIFY PARTY/INTERMEDIATE CONSIGNEE (Name and Full Address)

ALSO NOTIFY (Name and Full Address)/DOMESTIC ROUTING/
EXPORT INSTRUCTIONS/PIER-TERMINAL/ONWARD ROUTING
FROM POINT OF DESTINATION. FOR RELEASE OF CARGO
PLEASE CONTACT:

INITIAL CARRIAGE

PLACE OF RECEIPT
LOS ANGELES, CA

EXPORT CARRIER (Vessel, voyage)
SEALAND GUATEMALA VO16O7

PORT OF LOADING
LOS ANGELES, CA

PORT OF DISCHARGE
CORINTO

PLACE OF DELIVERY
CORINTO

PARTICULARS FURNISHED BY SHIPPER

| MARKS AND NUMBERS/ CONTAINER NUMBERS | NOS. OF PACKAGES | DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT KGS | MEASUREMENT CBM |
|---|---|---|---|---|
| WEIGHT 95041.91 | 9 CTNR | AES X20161121164325 217 PCS ) SOLAR PANELS & PARTS, NOS | 95044.91 KG 209536.0 LB | |
| | | ****FREIGHT PREPAID** ** SHIPPER LOAD & COUNT | | |
| MSKU5361479 CY/C | Size :40H | 26 PCS Seal:4249 | 11300.01 KG | |
| MSKU0522501 CY/C | Size :40H | 26 PCS Seal:4251 | 11300.01 KG | |
| MSKU0677960 CY/C | Size :40H | 26 PCS Seal:4269 | 11300.01 KG | |
| MSKU8696024 CY/C | Size :40H | 26 PCS Seal:4260 | 11300.01 KG | |
| MSKU3456612 CY/C | Size :40H | 26 PCS Seal:4266 | 11300.01 KG | |
| MSKU9812573 CY/C | Size :40H | 26 PCS Seal:4250 | 11300.01 KG | |
| TRLU3756030 CY/C | Size :20 | 9 PCS Seal:4282 | 3940.03 KG | |
| BROU4155950 CY/C | Size :40H | 26 PCS Seal:4251 | 11300.01 KG | |
| MSKU4062093 CY/C | Size :40H | 26 PCS Seal:4270 | 11300.01 KG | |
| TOTAL: | | 9 Container(s) Page 1 of 1 | | |

SHIPPER'S DECLARED VALUE: $
IF SHIPPER ENTERS A VALUE, CARRIER'S LIMITATION OF LIABILITY
SHALL NOT APPLY AND THE AD VALOREM RATE WILL BE CHARGED.

BILL OF LADING TO BE RELEASED AT

| FREIGHT RATES, CHARGES, WEIGHT AND/OR MEASUREMENTS (SUBJECT TO CORRECTION) | PREPAID | COLLECT |
|---|---|---|

REFRENDO
3 ply
12-12-2016

DATED AT PORT OF LOADING SHOWN ABOVE
For EXPEDITORS INTERNATIONAL OCEAN

BY                      DATE
as the Carrier

DECLARED VALUE CHARGES

TOTAL

**Exhibit 3**

# Expeditors International Ocean

**Expeditors**
BILL OF LADING

| SHIPPER (Name and Full Address) | SHIPPER'S I. D. BOX | BOOKING NUMBER | B/L NUMBER |
|---|---|---|---|
| ELECTRONICS INTERNATIONAL, USA INC ... PLANO TX 75074 U.S.A. | | 32049420 | 6070094241 |

**EXPORT REFERENCES**

| CONSIGNEE (Name and Full Address/Non-Negotiable Unless Consigned to Order) | FORWARDING AGENT REFERENCES |
|---|---|
| SOLNET S.A. EDIFICIO VISTA EXPO, #302, DE EDIFICIO ESTELI LOS NEGAL 500 ... | EXPEDITORS LAX 12200 E WILLIS AVE HAWTHORNE CA 90250 |

**POINT AND COUNTRY OF ORIGIN OF GOODS**
U.S.A.

| NOTIFY PARTY/INTERMEDIATE CONSIGNEE (Name and Full Address) | ALSO NOTIFY (Name and Full Address)/DOMESTIC ROUTING/EXPORT INSTRUCTIONS/PIER-TERMINAL/ONWARD ROUTING FROM POINT OF DESTINATION. FOR RELEASE OF CARGO PLEASE CONTACT: |
|---|---|

| INITIAL CARRIAGE | PLACE OF RECEIPT | LOS ANGELES, CA |
|---|---|---|
| EXPORT CARRIER (Vessel, voyage) SEALAND GUAYAMIL V01607 | PORT OF LOADING | LOS ANGELES, CA |
| PORT OF DISCHARGE CORINTO | PLACE OF DELIVERY CORINTO | |

**PARTICULARS FURNISHED BY SHIPPER**

| MARKS AND NUMBERS/CONTAINER NUMBERS | NOS. OF PACKAGES | DESCRIPTION OF PACKAGES AND GOODS | GROSS WEIGHT KGS | MEASUREMENT CBM |
|---|---|---|---|---|
| WEIGHT 75044.91 | 9 CTNR | EEI X20161129416433 237 PCS SOLAR PANELS & PARTS, NOS | 25044.91 KG 209550.0 LB | |
| | | ***FREIGHT PREPAID*** ** SHIPPER LOAD & COUNT | | |
| SEGU535147? CY/C? GESU??28?? CY/C? GESU6?7960 CY/C? EGHU596024 CY/C? MSKU454612 CY/C? MSKU561?573 CY/C? TRLU736021 CY/C? GESU?9??? CY/C? GESU6?9?? CY/C? ... | Size 4061 Size 4061 Size 4061 Size 4061 26 PCS 26 PCS 9 PCS 26 PCS 26 PCS | Seal:4258 Seal:4266 Seal:4270 Seal:4262 Seal:4261 Seal:4270 9 Container(s) Page 1 of 1 | 11300.01 KG 11300.01 KG 11300.01 KG 11300.01 KG 11300.00 KG 6500.01 KG 3940.00 KG 11300.01 KG 11300.01 KG | |

| SHIPPER'S DECLARED VALUE: $ _____ IF SHIPPER ENTERS A VALUE, CARRIER'S LIMITATION OF LIABILITY SHALL NOT APPLY AND THE AD VALOREM RATE WILL BE CHARGED. |
|---|

**BILL OF LADING TO BE RELEASED AT**

| PREPAID RATES, CHARGES, WEIGHT AND/OR MEASUREMENTS (SUBJECT TO CORRECTION) | PREPAID | COLLECT |
|---|---|---|
| | | |

The Goods, or the container(s) or package(s) said to contain the cargo herein mentioned, to be carried subject to all the terms and conditions of this Bill of Lading by the vessel named herein or any substitute at the Carrier's option and/or other means of transport, from the place of receipt or the port of loading to the port of discharge or the place of delivery shown herein and there to be delivered unto order or assigns. In accepting this Bill of Lading, Shipper (Shipper means the person entering into this contract of carriage with the Carrier, as stated on the face of this Bill of Lading) agrees to be bound by all stipulations, exceptions, terms, and conditions on the face and back hereof, whether written, typed, stamped or printed, as fully as if signed by the Shipper, any local custom or privilege to the contrary notwithstanding, and understands that Carrier's liability will be limited as set forth in Article 6, unless Shipper declares ad valorem valuation in excess of $500 per customary freight unit, and pays extra freight as required by the Carrier's published tariff. IN WITNESS WHEREOF THE CARRIER BY ITS AGENT HAS SIGNED 3 BILLS OF LADING, ALL OF THE SAME TENOR AND DATE, ONE OF WHICH BEING ACCOMPLISHED, THE OTHERS TO STAND VOID.

DATED AT PORT OF LOADING SHOWN ABOVE
For **EXPEDITORS INTERNATIONAL OCEAN**

**Exhibit 3**

COPY NOT NEGOTIABLE

## OCEAN BILL OF LADING
### FOR COMBINED TRANSPORT OR PORT TO PORT SHIPMENT

| SHIPPER (PRINCIPAL OR SELLER LICENSEE AND FULL ADDRESS) | B/L No. | NUMBER OF ORIGINALS |
|---|---|---|
| FLEXTRONICS AUTOMOTIVE USA (TEXAS), LLC 9600 JOE RODRIGUEZ EL PASO TX 79927, U.S.A | 611220137 | 1 |
| | SHIPPER'S REF. | BOOKING NUMBER |
| | | 086542654 |

**CONSIGNEE (NON-NEGOTIABLE UNLESS CONSIGNED TO ORDER)**
SOLARIS S,A
EDIFICIO VISTA LAGO #302.
DE EDIFICIO ESCALA 500 MTS AL SUR , LAS CUMBRES.
MANAGUA, NICARAGUA

## MT
## CONTAINER
## LINE LTD.

**NOTIFY PARTY (NO CLAIM SHALL ATTACH FOR FAILURE TO NOTIFY)**
SAME AS CONSIGNEE

**FOR DELIVERY PLEASE APPLY TO:**
MT CARGO EXPRESS NICARAGUA, S.A.
BO. ARLEN SIU, SEMAFOROS ENTRADA A SABANA GRANDE 150MTS.
ESTE 180 MTS. SUR
PHONe: 22485544
MANAGUA, NICARAGUA

| PLACE OF RECEIPT | PORT OF LOADING | PRECARRIAGE | |
|---|---|---|---|
| EL PASO, TX | LOS ANGELES, CA | | |
| VESSEL & VOYAGE | PORT OF DISCHARGE | PLACE OF DELIVERY | FREIGHT PAYABLE |
| MARINER V-701 | PUERTO CORINTO, NICARAGUA | CORINTO. | FREIGHT PREPAID |

| MARKS AND NUMBERS | QUANTITY | DESCRIPTION OF GOODS | GROSS WEIGHT (KGS) | MEASUREMENT (CBM) |
|---|---|---|---|---|
| SOLARIS S,A | 1 CTNR | (22 BULTOS) PANELES SOLARES Y SUS ACCESORIOS | 9635.70 KG | |
| DRYU-912315-9 / 1X40'DRY , 22 BLTS , 9635.70 KGS, SHIPPER SEAL: B383680 | | | 9635.70 KG | |

Licencia DGTAN N°.011

**REFRENDO**
ES CONFORME

Firma:
Fecha: 27-12-2016

$19671$

PAGE 1 OF 1

ONBOARD DATE DECEMBER 15, 2016

ORIGINAL

| FREIGHT AND CHARGES | BASIS | RATE | PREPAID | COLLECT |
|---|---|---|---|---|
| OCEAN FREIGHT SERVICES | | | AS AGREED | |

RECEIVED by the carrier the goods as specified above in apparent good order and condition unless otherwise stated, to be transported to such place as agreed, authorized or permitted herein and subject to all the terms and conditions appearing on the front and reverse of this bill of Lading to which the merchant agrees by accepting this bill of Lading, any local privileges and customs notwithstanding. The particular given above as stated by the shipper and the weight, measure, quantity, condition contents and value of the Goods are unknown to the Carrier In WITNESS whereof one (1) original Bill of Lading has been signed if not otherwise stated above, the same being accomplished to the other (s), if any to be avoid, if required by the Carried one (1) original Bill of Lading must be surrendered duly endorsed in exchange for the Goods or delivery order

| TOTAL (U.S. $) | TOTAL (U.S. $) |
|---|---|
| AS AGREED | |

PLACE AND DATE OF ISSUE_____

SIGNED ON BEHALF OF THE CARRIER          DECEMBER 15, 2016

**Exhibit 3**



Exhibit 4



## Commission and Set-off Agreement

THIS AGREEMENT is made and entered into as of the 20th of November 2016 ("Effective Date"), by and between RECOM AG, hereinafter referred to as "RECOM", a company organized and existing under the laws of Germany, with its main and registered office located at Langenbrahm str. 1, 45133, Essen, Germany, legally represented by Hamlet Tunyan of Arshalouis, and Inabata Europe GmbH, hereinafter referred to as "Inabata", a company organized and existing under the laws of Germany, with its main and registered office located at Am Seestern str. 4, 40547, Düsseldorf, Germany, legally represented by Masaru Inoue.

### WHEREAS

A. RECOM is a reputable company in the field of photovoltaic and has vast experience in production of PV cells and modules.

B. Inabata is a reputable company with vast experience in the trading of materials in the fields of IT and Electronics, Chemicals, Life Industry, Plastics and housing and Eco materials.

C. RECOM shall intermediate a transaction between Inabata and Flextronics International USA, Inc. in accordance with which Inbata shall purchase, at a preferential price, 12,5 MW of 270Wp Mono Full Black PV modules (hereinafter the "Products") which are currently stored in the USA.

D. The Products shall be delivered DAP (Incoterms 2010) Nicaragua.

### THE PARTIES HERETO AGREE ON AND ACCEPT THE FOLLOWING TERMS:

1. The Products shall be labeled RECOM.

2. RECOM shall provide and shall bear sole responsibility for all warranties regarding the Products. RECOM shall indemnify, defend and hold harmless Inabata from and against any claim, demand, lawsuit, cause of action or losses of any nature whatsoever, suffered or incurred by Inabata, arising out of, or in connection with any warranty claim.

3. RECOM authorizes INABATA to trade PV modules bearing the registered RECOM Community Trade Mark No. 012482832.

page 1 / 43

TADA EXHIBIT B

**Exhibit 5**

4.  RECOM shall receive from Inabata, for the intermediation of the abovementioned transaction, a commission amounting to 0,15267 USD-watt namely the amount of USD USD ("the commission"). The above amount is the result of the following calculation (12.500.000 Watts x 0,15267 USD- 1.908.375 USD).

5.  From the above amount shall be Inabata will deduct the cost of Inabata related to repackaging, relabeling, warehouse, transportation of the modules from the USA to Nicaragua under the DAP term, and cost of spare modules. Relative invoices shall be sent from Inabata to RECOM in order to define the final amount of the commission to be paid ("Final Commission")

6.  The commission shall be paid by Inbata to RECOM immediately upon shipment of the Products to Nicaragua.

7.  RECOM owes to Inabata, from previous transactions, the overdue amount of EUR 2,578,402.97 and USD 2,374,742.19 as of September 30th, 2016 ("Overdue Amount").

8.  The Parties agree that the amount of the Final Commission shall be set off against the amount which will be overdue at the time when the commission shall be due.

9.  In case that the commission due exceeds the overdue amount, the exceeding amount shall be wired by Inabata to the designated account of RECOM.

10. This agreement shall be construed under the laws of Germany and any dispute to arise from or in relation to the specific agreement shall be settled by the Courts of Dusseldorf.

This Agreement is the entire agreement between the parties with respect to the subject matter, and supersedes all prior agreements between the parties with respect to it.

Read, agreed and executed on the Effective Date.

page 2/43

**TADA EXHIBIT B**

**Exhibit 5**

RECOM AG

Name: Hamlet Tunyan
Title: Managing Director

INABATA Europe GmbH

Name: Masaru Inoue
Title: President

*page 3/3*

**TADA EXHIBIT B**

**Exhibit 5**

2017-06-28 8:55 GMT-06:00 Morten Nygart <morten.nygart@global2020.org>:

Dear Hamlet,

I have a lot of questions for you and then you can direct them to Spiros. He ofcause is welcome to answer as well as he is copied on this mail.

I guess that the panels were already in the US, originally intended for SunEdison, is that correct?

**Kind regards,**

**Morten Nygart**

CEO, **Global 2020**

Cell: +505 88528583

WhatsApp: +45 52400080
Skype: morten.nygart

2017-06-28 1:07 GMT-06:00 Hamlet Tunyan <Hamlet.Tunyan@recom-solar.com>:

Dear Morten,

Sunedison is not a Manufacturer.

Flex used to produce and for Sunedison and for many other manufacturers.

In your case, we sold you RECOM modules that were produced by Flex and not Sunedison.

**Exhibit 6**

We are sorting out now with Flex the label issue.

Spiros Corcokios copied herein from Flex will come back to us later during the day.


Regards



**Hamlet Tunyan**
CEO

**T:** 0049 211 546922291 **F:** 0049 211 546922292
Hamlet.Tunyan@recom-solar.com, www.recom-
solar.com
Königsallee 106, 40215 Düsseldorf, Germany


Confidentiality Notice: This email communication and any attachments are confidential and intended for the sole use of the designated and/or duly authorized recipient(s). If you are not the intended recipient or have received this email in error, please notify the sender immediately by email and permanently delete email including all attachments without reading, copying, opening or forwarding it. Any unauthorized use or dissemination or disclosure, either in whole or partially, is prohibited. Emails are susceptible to alterations. Neither RECOM nor any of its subsidiaries or affiliates shall be liable for the email if altered, changed or falsified. If you are the intended recipient, secure the contents in a manner that conforms to all applicable state and/or federal requirements related to privacy and confidentiality of such information.

**Be Green: One MW at a time, let's save the world!**


On 28 Jun 2017, at 08:53, Morten Nygart <morten.nygart@global2020.org> wrote:

Hi Hamlet,


I am not referring to where you might have purchased the panels. I am referring to my call to you when I told you that your panels were delivered in boxes with a SunEdison logo which appeared after the tape fell off. I am interested in the truth and nothing else. I am asking you this for the simple reason that we must be truthful and sincere if we are to move forward and solve this in a decent and respectful manner. Can you confirm that what I am saying is correct?

**Exhibit 6**

**Kind regards,**

Morten Nygart

CEO, **Global 2020**

Cell: +505 88528583

WhatsApp: +45
52400080
Skype: morten.nygart

2017-06-28 0:28 GMT-06:00 Hamlet Tunyan <Hamlet.Tunyan@recom-solar.com>:

Morten,

We did not purchase modules from Sunedison but from Flex, hence our agreement and warranties are with Flex.

Regards

**Hamlet Tunyan**
CEO

**T:** 0049 211 546922291, **F:** 0049 211 546922292

**Exhibit 6**

Hamlet.Tunyan@recom-solar.com, www.recom-solar.com
Königsallee 106, 40215 Düsseldorf, Germany

<image003.jpg>

**Be Green: One MW at a time, let's save the world!**

Confidentiality Notice: This email communication and any attachments are confidential and intended for the sole use of the designated and/or duly authorized recipient(s). If you are not the intended recipient or have received this email in error, please notify the sender immediately by email and permanently delete email including all attachments without reading, copying, opening or forwarding it. Any unauthorized use or dissemination or disclosure, either in whole or partially, is prohibited. Emails are susceptible to alterations. Neither RECOM nor any of its subsidiaries or affiliates shall be liable for the email if altered, changed or falsified. If you are the intended recipient, secure the contents in a manner that conforms to all applicable state and/or federal requirements related to privacy and confidentiality of such information.

**エラー! ファイル名が指定されていません。**

On 28 Jun 2017, at 08:22, Morten Nygart <morten.nygart@global2020.org> wrote:

Hi Hamlet,

Will you please confirm that you told me that the panels were not from SunEdison.

**Kind regards,**

**Morten Nygart**

CEO, **Global 2020**

Cell: +505 88528583

WhatsApp: +45 52400080
Skype: morten.nygart

**Exhibit 6**

2017-06-28 0:19 GMT-06:00 Hamlet Tunyan <Hamlet.Tunyan@recom-solar.com>:

Morten Hi,


Our agreement is with FLEX and NOT with Sunedison.

Our warranties are backed by FLEX and not Sunedison.

Further information you will receive from the Technical team.


Regards


**Hamlet Tunyan**
CEO

**T:** 0049 211 546922291, **F:** 0049 211 546922292
Hamlet.Tunyan@recom-solar.com, www.recom-
solar.com
Königsallee 106, 40215 Düsseldorf, Germany

<image003.jpg>

**Be Green: One MW at a time, let's save the world!**
Confidentiality Notice: This email communication and any attachments are confidential and intended for the sole use of the designated and/or duly authorized recipient(s). If you are not the intended recipient or have received this email in error, please notify the sender immediately by email and permanently delete email including all attachments without reading, copying, opening or forwarding it. Any unauthorized use or dissemination or disclosure, either in whole or partially, is prohibited. Emails are susceptible to alterations. Neither RECOM nor any of its subsidiaries or affiliates shall be liable for the email if altered, changed or falsified. If you are the intended recipient, secure the contents in a manner that conforms to all applicable state and/or federal requirements related to privacy and confidentiality of such information.

Exhibit 6

**エラー! ファイル名が指定されていません。**

On 28 Jun 2017, at 08:10, Morten Nygart <morten.nygart@global2020.org> wrote:

Dear All,

As you can see from the photo the boxes had a tape put on the front. After two months the tape fell of a few boxes. It was noticed by the due diligence team from CIFI. They checked inside the boxes and much to their satisfaction the concluded that the panels we not SunEdison but Recom. Same day I contacted Hamlet to ask what that was about and how they could put in such an embarrassing situation. Clearly it was embarrassing to have the boxes of a bankrupt solar company on site.

Hamlet told me not to worry. He stated that they must have had old boxes from SunEdison on the factory that they had used to pack the panels from Recom. He assured me that the Panels were not SunEdison but Recom, as agreed.

Hamlet, I am sure that you will verify this.

<WhatsApp Image 2017-01-07 at 08.45.36 (1).jpeg>

**Kind regards,**

**Morten Nygart**

CEO, **Global 2020**

Exhibit 6

Cell: +505 88528583

WhatsApp: +45
52400080
Skype: morten.nygart

2017-06-27 16:39 GMT-06:00 Scarlett Nygart <scarlett.nygart@gmail.com>:

Dear Tada-san:

Dear Tada-san:

About 3 months ago, during a due diligence inspection, we noticed the panel boxes said "Sun Edison" . Moren asked Hamlet whom stated it was nothing, that he had told his people NOT use these boxes, but that it had nothing to do with the panels.  I believe here , Hamlet should have told us he had relabel the panels.

During the inspection of  Meteocontrol, a detail inspections, it was noticed that the panels were overheated with unusual hot spots and noticed there were "Re-labels" on top recom and in the bottom Sun Edison-  However, what is worse, the current in sun edison is lower to the one specification in our contract.  As you know Tada-san, our park was build around the the specific specifications of our panels...this totally compromises the the whole technical aspects of the entire solar park.   This is NOT small and any expert can tell you that!!

Please read the specification Morten sent you in the picture in his previous email... you can see the specifications of sun edison Vs. recom which are the exact specification we use for our park . Therefore, Tada-san, not only we have an issue on the technical part, but also with the bank...this affects us !!!!! not to mention all that comes with it...!!!!!

So, on this note, this issue has nothing to do with wire transfer.... i believe the problem at hand is bigger than that!  However, you will be able to see by bringing onsite, an expert to asses this!  You must see it for yourself and Hamlet should come as well.

**Exhibit 6**

Will it be possible that you send someone this week?  I will like your expert to come down this week while we have the entire team there please.

This way when we meet next week, we can have a meeting with facts in hand.  We must act fast as we need to solve this...there is a lot at stake here...

Please advise when will your expert/technician come down and pelase confirm your arrival date next.  May i suggest Monday July 3rd?

It is importan to emphasize in response to your statement here, the panels are NOT Recom and they Are NOT the same specification as per the picture Morten sent you.

We look forward to talking to you and finding a very prompt solution.  Please tell Recom we run out of spare parts, we need to change another bunch of panels...

Best REgards,

Scarlett

On Tue, Jun 27, 2017 at 2:28 PM, <tada.toyotomi@inabata.com> wrote:

Dear Morten-san

We don't breech any contract for the modules at all.

The modules has been produced by Flex in Malaysia, which is one of Recom's subcontractors.

It is definitely Recom Brand!!

**Exhibit 6**

Now you put your lawyer in front and pushed all defaults to us.

I have questions.

Do you intend stop the payment to us this time?

If you do it on purpose, it will be  very much difficult for us to get the approval for joining further project.

Also are you willing to settle the issue between lawyers??

Anyway awaiting of your reply soon.

Thank you

P.S I am trying to call you many times, but not succeeded in connecting you. I can go to Nicaragua next week.

Inabata Europe GmbH

Tada Toyotomi

Am Seestern 4, 40547 Düsseldorf Germany

Tel +49 211 957 76298

Mobile +49 (0)151 1108 7205

**From:** Brent Abadie [mailto:knightabd@hotmail.com]
**Sent:** Tuesday, June 27, 2017 5:56 PM
**To:** Morten Nygart; Hamlet Tunyan; Aram Spartalian; Toyotomi Tada (多田 豊富); Kazuto Oishi; Scarlett Nygart; Jim Jakobsen
**Subject:** RE: Meteocontrol detects panels relabelling and faillure
**Importance:** High

Ladies and Gentlemen:

Exhibit 6

I have discussed this matter briefly with Morten. I note that there is an error in the first sentence of the second paragraph of his communication. It is my understanding that the current produced by the installed panels (Sun Edison) is NOT the same as the specified Recom panels. I again reiterate the seriousness of the problem.

At this point, I will refrain from an in depth discussion of the legalities. However, it is crucial to take certain fundamental steps as set forth in the various contracts. Those formalities include the following:

1. This communication should be considered as a formal demand tendered to both Inabata and Recom to provide the panels and materials as specified in the contracts, specification sheets, and various project documents. The non-complying panels are a breach of contract and require prompt remedy.

2. This communication should be considered by both Inabata and Recom as a Notice of Default on their contractual obligations. Further performance of the buyer's obligations shall be suspended and delayed until such time as the default is cured, all as provided in the various contracts between the parties.

3. This communication should be considered by both Inabata and Recom as a demand for performance pursuant to the warranty (express and implied) provisions of their contracts, and as a demand to remedy the defects in the panels and/or workmanship resulting in delivery of current not in compliance with the specifications and hot spots. Additionally. This is a demand for remedy of consequential damages caused to other components of the system.

The gravity of the problem cannot be understated. The viability of the project is at risk. The license granted by the Government of Nicaragua is at risk. The financing and/or marketability of the project is at risk. Solaris and its related companies are at risk of defaulting on their obligations. The PPA is at risk. The reputation of Global2020, Solaris and Green are at risk. The entire investment of money, time and effort are at risk. All of the potential profits that could be derived from the project and future expansion are at risk. The economic and consequential damages are quite substantial.

Global2020/Green/Solaris, Recom and Inabata have worked together for quite some time to bring this project this far. Obviously, this team can benefit in future phases of the overall project. It is in the

Exhibit 6

mutual interest of all of the parties to cooperatively work together to remedy this problem.  Therefore, I urge all of the parties to convene in Nicaragua to jointly pool their resources and efforts to develop a resolution.

Time is of the essence.  Please give this matter your highest priority.  We look forward to your reply.

On behalf of Global2020, Green and Solaris,

Brent P. Abadie

Attorney at Law

Sent from Mail for Windows 10

**From:** Morten Nygart
**Sent:** Tuesday, June 27, 2017 9:47 AM
**To:** Hamlet Tunyan; Aram Spartalian; Toyotomi Tada; Kazuto Oishi; Scarlett Nygart; Jim Jakobsen; Brent Abadie
**Subject:** Meteocontrol detects panels relabelling and faillure

Dear All,

Meteocontrol have been on site for 6 days now for acceptance test. During the test they found that our panels are not Recom but Sun Edison. The Recom label has been placed on top of the Sun Edison label to hide the actual producer. This is very serious and has a number of implications for Recom and Inabata. Needless to say it has a devastating influence on our project.

**Exhibit 6**

From the real product label, Sun Edison, we also see that the current in the panel is same as what Recom is stating on their label. This has serious technical implications and obviously a extremely serious warranty and insurance problem

I enclose photo evidence.

As reported over the last 2 weeks, we are experiencing panel faillures at an unusual scale. The problem is that the junction box is blowing up. The German team that most likely, the junction box:

- There could be a bad connection point from the Junction Box to the module (hot spot at the connection point)
- The diodes inside the junction box are getting to hot and are not able to handle the high current.

This coincides with Meteocontrol's finding very high amount of hot spots. This could also implicate a serie failures.

The situation is completely unacceptable and it's proven that modules have been re-labelled. As mentioned that has implications far beyound plain technical or warranty issues and the consequence could be very serious.

Before making decisions on how to proceed in this delicate matter we will require a complete technical clarification and urge Inabata and Recom meet with us in Nicaragua next week.

I am copying or US lawyer, Brent.

**Exhibit 6**



**Exhibit 6**

**Kind regards,**

**Morten Nygart**

CEO, **Global 2020**

Cell: +505 88528583

WhatsApp: +45
52400080
Skype: morten.nygart

<image006.jpg><image004.jpg>

Exhibit 6

Legal Disclaimer:
The information contained in this message may be privileged and confidential. It is intended to be read only by the individual or entity to whom it is addressed or by their designee. If the reader of this message is not the intended recipient, you are on notice that any distribution of this message, in any form, is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete or destroy any copy of this message!

**Exhibit 6**



Product Service

TÜV SÜD Product Service GmbH   Ridlerstraße 65 · 80339 München   Deutschland

**Mehr Sicherheit.
Mehr Wert.**

Gespa Energy
C/O Mycklebust
Morten Nygart
Edenvej 3
3100 Hornbaek
Denmark

| Ihre Zeichen/Nachricht vom | Unsere Zeichen/Name | Tel.-Durchwahl/E-Mail | Fax-Durchwahl | Datum | Seite |
|---|---|---|---|---|---|
| | Martin Elsner | 089 5008-4252 martin.elsner@tuev-sued.de | 089 5008-4230 | 2017-08-29 | 1 von 1 |

**Enquiry regarding validiy**

Dear Mr. Nygard,

Thank you for your e-mail dated 2017-08-29.

According to our database your enquired certificates Z2 15 06 85231 031 for model SE-F-270KXD-38 held by SunEdison Products Singapore Pte Ltd and Z2 16 12 97650 001 held by RECOM AG are shown as invalid.

Please note that the blacklist entries are regarding the company Recom LTD, Greece, with reason forged documents.

If you have any questions, do not hesitate to contact us.

Sincerely,

i.A. Jari Andre Henrich

i.A. Martin Elsner

Sitz: München
Handelsregister München HRB 85 742
UniCredit Bank AG · BIC HYVEDEMMXXX
IBAN DE13 7002 0270 0048 8522 11
USt-IdNr. DE129484267
Informationen gemäß § 2 Abs. 1 DL-InfoV
unter www.tuev-sued.de/impressum

Aufsichtsrat:
Dirk Eilers (Vorsitzender)
Geschäftsführer:
Dr. Jens Butenandt
Robert Kees

Telefon: +49 89 5791-0
Telefax: +49 89 5791-4230
www.tuev-sued.de
TÜV®

TÜV SÜD Product Service GmbH
Ridlerstraße 65
80339 München
Deutschland

Exhibit 7



# RECOM, a reliable partner to the 100 MW pipeline in Nicaragua

Published on June 3, 2017

Alisa Papadimitriou | + Follow
International BD Manager at Recom Corporation
18 articles

🔥 27   💬 2   ➴ 4

**RECOM** is delighted to announce successful commissioning of **12.5MW solar project** in the region of **Puerto Sandino in Nicaragua built with 46000 pieces of 270 Wp Black Panther mono modules**. The project is the first part of Nicaragua's pipeline totaling 100 MW.

Considered to be **the largest solar project** in Nicaragua with production estimated at **an annual capacity of 18.18 GWh,** it marks an important milestone in efforts to establish a firm commitment to renewables.

Erected in less than 5 months, it is also a significant addition to an extensive track record of successful utility-scale projects that were built with RECOM modules worldwide.

**RECOM** has already commenced the second phase of the .project of another 12.5MW confirming its strong involvement in the country's solar energy development plans.

Report this

27 Likes


+17

2 Comments

Troy Yao
Shezhen KSTAR New Energy Co.,Ltd - Area Sales Manager

9mo ···

Messaging

**Exhibit 8**

congratulation! But.... how to contact with you if want to cooperate with your company

Like   Reply  |   1 Reply

> **Alisa Papadimitriou**                                                         9mo  ...
> International BD Manager at Recom Corporation
>
> Hi Troy, thank you for the interest, we cooperate already with 4 manufacturers of
> inverters, if we decide to add another, I will let you know.
>
> Like   Reply  ⋮

**Raymond Bailey**                                                                9mo  ...
Heliene is a North American based manufacturer of high-quality and efficiency photo-voltaic modules.

If you need a quote on a North American tier 1 PV modules email me
**rbailey@heliene.com**

Like   Reply  ⋮   1 Reply

> **Alisa Papadimitriou**                                                         9mo  ...
> International BD Manager at Recom Corporation
>
> Hi Raymond, thank you for the offer, but we use only our own brand - RECOM
> modules.
>
> Like   Reply  ⋮



**Alisa Papadimitriou**
International BD Manager at Recom Corporation

+ Follow

**More from Alisa Papadimitriou**   See all 18 articles                            ‹

| RECOM receives the Gözetim Belgesi for the supply of 200 MW in Turkey | Recom-Sillia outgrowing French borders | Recom-Sillia dépasse les frontières françaises | Financing PV p markets |
|---|---|---|---|
| Alisa Papadimitriou on LinkedIn | Alisa Papadimitriou on LinkedIn | Alisa Papadimitriou on LinkedIn | Alisa Papadim |

Messaging ☑ ⚙

**Exhibit 8**




 RECOM

HOME     PRODUCTS & SERVICES     RESIDENTIAL     COMMERCIAL

UTILITIES     PROJECTS     CONTACT

# RECOM as strong partner to Nicaragua's 100 MW pipeline



**DÜSSELDORF, Germany, May 24 –**,  RECOM, a top tier German manufacturer, with steady growth, proven quality, reliability and financial solidity, is delighted to announce successful commissioning of a **12.5MW solar project** in the region of **Puerto Sandino in Nicaragua**. The project is first part of Nicaragua's pipeline totalling 100 MW, which is expected to be built and commissioned in its entity until end of 2018.

A coastal town attracting surfers from all over the world, Puerto Sandino has become a host of **the largest solar project** in Nicaragua and marks an important milestone in Nicaragua's involvement in solar energy.

**Exhibit 8**

Case 3:17-cv-00306-PRM   Document 54-2   Filed 02/17/18   Page 2 of 3

Over 46000 pieces of **RECOM's 270Wp Black Panther mono** modules were deployed and the overall project, that will produce **an annual capacity of 18.18 GWh,** was erected in less than 5 months, proving once more our strong business acumen, expertise and track record of successful utility-scale projects worldwide.

Nicaragua is one of the many countries that has chosen to **invest in solar-generated power** through the effective utilisation of the constantly developing renewable energy technology. Hence, the country intends to have 90% of its primary energy supply come from those sources by 2020.

"The Puerto Sandino solar park is our first venture in Nicaragua and highlights our commitment to deliver **high quality** products and collaborate with markets that can fully grasp the importance of having access to affordable energy while at the same time preserving natural environment", says RECOM CEO, Hamlet Tunyan.

The successful implementation of the Puerto Sandino solar park has paved the way for the great potential of solar future in the country and  RECOM has already moved on to the second phase of the project bearing a size of another 12.5MW, thus confirming its involvement in the country's solar energy development plans.

*Address: Königsallee 106, Düsseldorf 40215, Germany*
*Phone & Fax numbers: (P) 49211546922291 (F) 49211546922292.*
*Email: marketing@recom-solar.com.*
*Web: www.recom-solar.com*

Back

**Exhibit 8**

About Us

Press Releases

Downloads

Careers

f   in

© COPYRIGHT 2018, RECOM

Terms & Conditions Privacy Policy IMPRINT

**Exhibit 8**